UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FRANZ SCHLEICHER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:02-cv-1332-DFH-TAB |
| | ) | |
| GARY C. WENDT, WILLIAM J. SHEA, | ) | |
| CHARLES B. CHOKEL and | ) | |
| JAMES S. ADAMS, | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Franz Schleicher and others who purchased securities from Conseco, Inc. have sued four senior executives of the company for securities fraud between April 24, 2001, and August 9, 2002 (the "Class Period"). Plaintiffs dismissed their claims against Conseco itself after the company went through bankruptcy, which both delayed this case and resulted in discharge of these plaintiffs' claims against the company. Plaintiffs accuse the individual defendants of violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a), by issuing false and misleading statements to the investing community on the status of Conseco's operations during the Class Period. The court has not yet addressed plaintiffs' class allegations. The issue now before the court is whether the consolidated amended complaint survives a motion to dismiss.

Invoking the heightened pleading standards of both Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified in 15 U.S.C. § 78u-4(b), defendants have moved to dismiss plaintiffs' complaint for failure to state a claim upon which relief can be granted. As explained below, the court finds that plaintiffs have failed to allege loss causation adequately under the standards set forth by the Supreme Court's recent decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. —, 125 S. Ct. 1627 (2005). Accordingly, the defendants' motion to dismiss is granted. Plaintiffs have an opportunity to amend their complaint if they wish to do so.[1]

I.      *Standards for Dismissal*

In ruling on a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the court must assume as true all well-pleaded facts set forth in the complaint, construing the allegations liberally and drawing all inferences in a light most favorable to the plaintiff. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). Under the liberal notice pleading standard in federal civil actions, the plaintiff is entitled to the benefit not only of his allegations but of any other facts he might assert that are not inconsistent with his allegations. Defendants are entitled to dismissal only where "it appears beyond doubt that the plaintiff can

---

[1]Defendants Wendt, Shea, and Chokel have filed one brief, and defendant Adams has filed a separate brief. Adams' brief raises issues specific to him but adopts and incorporates much of the other defendants' brief. The court's decision does not depend on any differences among the four defendants.

prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Chaney v. Suburban Bus Division*, 52 F.3d 623, 626-27 (7th Cir. 1995).

In a securities fraud case like this one, however, the standards are raised by two provisions of the law. Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff alleging fraud to allege "with particularity" the circumstances constituting fraud. *In re HealthCare Compare Corp. Securities Litigation*, 75 F.3d 276, 281 (7th Cir. 1996); Fed. R. Civ. P. 9(b). This requirement means in essence that the plaintiff must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *In re HealthCare Compare*, 75 F.3d at 281, quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Rule 9(b) allows intent, knowledge, or other states of mind to be alleged generally. In securities fraud cases, the PSLRA further requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2); accord, *e.g.*, *In re HealthCare Compare*, 75 F.3d at 281.

II.     *Loss Causation*

To state a viable § 10(b) claim, a plaintiff must allege that "the act or omission of the defendant alleged to violate [§ 10(b) ] caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4); see also *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir. 1990) (plaintiff must show that "but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains").

In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. —, —, 125 S. Ct. 1627, 1631 (2005), the Supreme Court addressed the requirement of loss causation, "a causal connection between the material misrepresentation and the loss."  In *Dura Pharmaceuticals*, the Ninth Circuit had held that a plaintiff adequately alleged loss causation by alleging that the defendants' misrepresentation caused the market price of the security to be artificially inflated when the plaintiff bought it.  The Supreme Court reversed, holding unanimously that more was required.

How much more?  As *Dura Pharmaceuticals* came to the Supreme Court, the issue was whether plaintiffs could pursue a claim that the defendants falsely claimed that a new spray device for treating asthma would receive FDA approval.  At the close of the class purchase period, the defendant's stock price fell dramatically for other reasons.  Not until eight months after the close of the class period did the defendant announce that the FDA had not approved the new spray

device.   Defendants   argued   that   the   timing   meant   that   the   alleged
misrepresentation concerning the spray device could not possibly have caused any
loss to the plaintiffs.

Plaintiffs   pursued   the   securities   fraud   claim   on   the   theory   that   the
defendants' false predictions for the spray device had artificially inflated the stock
price   above   an   honest   price.   The   problem   lay   in   the   timing   of   the   relevant
disclosure.   The   key   allegation   missing   from   the   complaint,   in   the   Supreme
Court's view, was an allegation "that Dura's share price fell significantly after the
truth became known."   125 S. Ct. at 1634.   The absence of such an allegation,
wrote the Court, "suggests that the plaintiffs considered the allegation of purchase
price inflation alone sufficient."   *Id.*   The Court went on to affirm the district
court's dismissal of the relevant claims in the complaint because it did not allege
loss causation with respect to the alleged misrepresentations concerning the spray
device.   The   complaint   would   need   to   give   the   defendants   notice   of   the   alleged
economic loss and the alleged causal connection between the loss and the relevant
misrepresentation.   *Id.*

In   the   1980s   and   1990s,   Conseco   grew   rapidly   in   the   insurance   and
financial services industries.   The company began to encounter serious financial
difficulties   after   its   $6   billion   acquisition   in   1998   of   Green   Tree   Financial
Corporation,   which   later   became   known   as   Conseco   Finance.   After   the
acquisition, Conseco took on an additional $3.6 billion in debt to cover losses at

Conseco Finance.   In April 2000, Conseco CEO Steve Hilbert and other senior executives resigned.  At that time, Conseco's stock price had fallen to $5.62 per share, meaning it had lost more than 90% of the value it had before the Green Tree acquisition.  This loss occurred *before* the plaintiffs in the present case made any of their investments at issue here.

In the summer of 2000, the Conseco board brought in a new management team to turn the company around after two disastrous years.  The new team included the individual defendants in this case:   Gary C. Wendt as CEO, William J. Shea as COO and CFO, Charles B. Chokel as CFO, and James S. Adams as chief accounting officer.  The new team ultimately did not succeed in turning the company around.  On December 17, 2002, Conseco filed for Chapter 11 bankruptcy protection.

The focus in this lawsuit is on a particular 16-month period during the long slide of Conseco stock price from lofty heights to zero.  In early September 2000 under the new management, Conseco stock traded around $9.00 per share.  By the start of the Class Period, the price had risen to $16.98, and it climbed as high as $19.82 per share on May 3, 2001.  Plaintiffs seek to represent a class of those who bought Conseco stock beginning on April 24, 2001, and ending on August 9, 2002, when the company announced that it was delaying payment on some debt and had retained legal and financial advisors to help it restructure its corporate debt.  In October 2001, the stock went below $5.00 per share.  It never went above

that level again.  On August 9, 2002, the last day of the Class Period, the stock price declined from 34 cents per share to about 11 cents per share.  On August 12th, the New York Stock Exchange halted trading in Conseco stock.  The stock continued to trade on "pink sheets" for a few cents per share, but lost all value in the bankruptcy proceeding launched in December 2002.

Plaintiffs allege that, during the 16-month period from April 24, 2001, to August 9, 2002, defendants were responsible for misleading the investing community about the success of their rescue efforts in several ways:

    1.    Undisclosed guaranty obligations of $900 million on so-called "B-2" certificates that Conseco Finance pledged as collateral for its credit facility with Lehman Brothers, combined with accounting that treated Conseco's payments to itself as operating income.

    2.    Undisclosed operating deficit from inadequate loan servicing fees.

    3.    Undisclosed $2 billion loss contingency arising from poor documentation on "exception loans" sold to securitization trusts.

    4.    Failure to write-down the value of interest-only securities as projected cash flows and interest rates dropped.

    5.    Concealing the number of delinquent consumer loans.

    6.    Failing to adhere to published credit-quality standards for consumer loans.

    7.    Undisclosed losses from loans to directors and officers.  Under Hilbert's management, Conseco had set up a program under which officers and directors borrowed hundreds of millions of dollars from a bank and used the proceeds to buy Conseco stock, which of course continued to fall in value.  Conseco guaranteed to the bank that the loans would be repaid.  During the Class Period, Conseco continued to list the scheduled loan repayments as assets, yet according to

plaintiffs, the defendants knew that Conseco did not expect and was not planning to seek repayment by the officers and directors.

8.      Failure to include the director and officer loans in debt repayment plans, with the effect of misrepresenting the company's viability.

Notwithstanding these allegations, the record of Conseco's public statements and SEC filings during the attempted turnaround is replete with other bad news.  Effective January 1, 2002, Conseco wrote off approximately $2.9 billion in goodwill.  In May 2002, Moody's downgraded Conseco's senior debt rating from "B-2" to "Caa1."  In July 2002, A.M. Best downgraded the financial strength rating for the company's insurance subsidiaries.  In the third quarter of 2002, Conseco realized nearly $500 million in losses in its investment portfolio.  This is not so much a case where plaintiffs are alleging that defendants painted a falsely rosy picture.  It is more as if plaintiffs allege that defendants painted with shades of gray that were not quite dark and gloomy enough.

For present purposes, the most important point here is that the truth about matters that plaintiffs allege were concealed or misrepresented did not come out publicly until months after the end of the class period, even during the bankruptcy litigation itself.  This is not a case where plaintiffs can point to a sharp drop in the company's stock price following announcement of the allegedly concealed truth.  The stock had long since hit bottom before these alleged misrepresentations became known.

Plaintiffs' brief in opposition to dismissal relied on the Ninth Circuit's decision in *Dura Pharmaceuticals* and other cases taking a similar approach, holding that a plaintiff could allege loss causation merely be stating that the misrepresentation artificially inflated the price of the security at the time of purchase.  See Pl. Br. at 42-43 (Docket No. 101).  In fact, the brief asserts "the absurdity of applying a loss causation standard which requires the value of plaintiffs' shares to decline following the revelation of the truth."  *Id.* at 41.  The brief was written before the Supreme Court decided the case, of course, and adopted that very position.

Plaintiffs have responded to the Supreme Court's decision by suggesting that there may be other ways in which a securities fraud plaintiff might plead loss causation.  For example, plaintiffs seize on Justice Breyer's use of the phrase "leak out" in the sentence:  "But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."  544 U.S. at —, 125 S. Ct. at 1631; see also *In re Tyco Int'l Ltd.*, 2004 WL 2348315, *14 (D.N.H. Oct. 14, 2004) (denying motion to dismiss where complaint alleged that company's "stock price declined in part because investors concluded that they could no longer credit the company's denials of accounting misconduct").  Plaintiffs in this case suggest they can prove that the truth was beginning to "leak out" about some of the matters they allege, contributing to the massive decline in Conseco stock prices during the Class Period as Conseco disclosed a host of financial problems it faced.  See Docket No. 128 at 5.  Whether

the Court's use of the phrase "leak out" shows that plaintiffs' suggestion would be sufficient under *Dura Pharmaceuticals* is not clear.  It is clear, however, that this theory is certainly not what plaintiffs have alleged in the operative complaint.  The Supreme Court's opinion makes clear that a plaintiff must give a defendant fair notice of his loss causation theory in the complaint.  544 U.S. at —, 125 S. Ct. at 1634.

Plaintiffs also suggest that they have alleged loss causation when the stock lost its last 34 cents or so of value in August 2002 in response to the company's own announcement that it was delaying payment on some debts and had hired advisors to help restructure its corporate debts.  Plaintiffs described this latter announcement as "a stunning blow" to the investing public.  It is not clear to the court how the investing public could be "stunned" by news that drove a company's already battered stock value down from a mere 34 cents per share, especially since the stock had once been worth approximately $60.00 per share.  All of plaintiffs' investments during the class period can fairly be described as speculative investments in a company in deep trouble.

In any event, the Supreme Court's decision in *Dura Pharmaceuticals* has undermined plaintiffs' theory of loss causation as pleaded in the complaint. Perhaps plaintiffs can salvage some portions of the case under the *Dura Pharmaceuticals* standard.  They are entitled to try to do so by amending their complaint, though in light of the many and daunting problems Conseco faced, the

-10-

problem of loss causation may pose a major challenge of proof even if plaintiffs can plead it adequately for a portion of the case.  The court does not reach the issue of whether plaintiffs adequately alleged scienter because it seems likely that any amended version of the complaint may be considerably different from the current version.

III.   *Control Person Liability*

Although the complaint must be dismissed on the loss causation ground, the potential for an amended complaint makes it prudent for the court to address another defense argument that seeks complete dismissal.  Plaintiffs allege that the individual defendants are liable for securities fraud under § 20(a) as "controlling persons" of Conseco.  Section 20(a) of the Exchange Act establishes liability as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.  Defendants  argue that they can be held liable under § 20(a) only "*to the same extent as*" Conseco is held liable.  Since Conseco was discharged in bankruptcy from any potential liability under the Exchange Act, defendants argue, plaintiffs cannot state a claim against them under § 20(a).

-11-

Plaintiffs counter by citing *Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971). In *Kemmerer,* the alleged primary violator was dissolved by the defendants. Defendants there, like the defendants here, argued they could be held liable under § 20(a) only to the same extent as the alleged primary violator; *i.e.*, not at all.  The court disposed of the defendant's argument as follows:

> The premise of this argument is that there is a finding of "no liability" with respect to the [alleged primary violator].  No such finding exists, it appearing instead that the Association was dismissed from the suit for lack of jurisdiction due to a failure to obtain service of process. It further appears that the reason for the failure to obtain process was that the Association had been dissolved on the initiative of many of the individual defendants in the present suit.  On such facts it is evident that [§ 20(a)] is of no avail to defendants.

*Id.* at 78.  While *Kemmerer* involved the alleged primary violator's dissolution rather than its bankruptcy, the Seventh Circuit's reasoning applies here.  Accord, *In re CitiSource, Inc. Securities Litigation*, 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988); *Elliott Graphics, Inc. v. Stein*, 660 F. Supp. 378, 381-82 (N.D. Ill. 1987).  Conseco has not been found "not liable" for securities fraud.  Also, it would be inconsistent with the broad remedial purposes of the securities laws to permit senior executives of a bankrupt corporation – whose actions allegedly contributed to the bankruptcy – to avoid liability by relying on the corporation's bankruptcy.

Plaintiffs' allegations purporting to establish defendants' control over Conseco are sufficient.  The Seventh Circuit views § 20(a) "as remedial, to be construed liberally, and requiring only some indirect means of discipline or

influence short of actual direction to hold a control person liable." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992) (quotation omitted). The Seventh Circuit looks to whether the alleged control-person "actually participated in, that is, exercised control over, the operations of the person in general and, then, to whether the alleged control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Id.* at 881. The fact that each defendant signed at least one of the SEC filings alone satisfies this standard.  And the complaint as a whole makes clear that each defendant – as CEO (Wendt), COO and CFO (Shea), CAO/Treasurer (Adams), and Executive Vice President/CFO (Chokel) – cannot plausibly deny the kind of control implied by the Seventh Circuit's liberal construction of § 20(a).  See also Complaint ¶¶ 290-91.  Because of changes in the defendants' positions during the Class Period, issues of potential individual liability will still need to be reconsidered in light of amendments plaintiffs might make to their complaint in response to this decision.

Accordingly, the defendants' motions to dismiss are hereby granted.  The Consolidated Class Action Complaint is hereby dismissed.  The dismissal is without prejudice to plaintiffs' right to file an amended complaint no later than August 24, 2005.

So ordered.

Date: July 14, 2005

_David F. Hamilton_

_____

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kwasi A. Asiedu
LAW OFFICE OF KWASI ASIEDU
3858 Carson Street, Suite 204
Torrance, CA 90503

Brian Joseph Barry
LAW OFFICES OF BRIAN BARRY
bribarry1@yahoo.com

Peter A. Binkow
GLANCY BINKOW & GOLDBERG LLP
pbinkow@glancylaw.com

Bruce D. Brattain
BRATTAIN & MINNIX
mario000@ameritech.net

Claudia Jean Bugh
GLANCY BINKROW & GOLDBERG LLP
cjbjdcpa@aol.com

Brian Eugene Casey
BARNES THORNBURG
brian.casey@btlaw.com

Lionel Zevi Glancy
GLANCY & BINKOW LLP
info@glancylaw.com

Michael Marc Goldberg
GLANCY BINKOW & GOLDBERG
info@glancylaw.com

Michael H. Gottschlich
BARNES & THORNBURG
mgottsch@btlaw.com

Steven Kenneth Huffer
HUFFER & WEATHERS
steve_huffer@hufferandweathers.com

Robert J. Kopecky
KIRKLAND & ELLIS
rkopecky@kirkland.com

Elizabeth A. Larsen
KIRKLAND & ELLIS
blarsen@kirkland.com

Daniel Edward Laytin
KIRKLAND & ELLIS, LLP
dlaytin@kirkland.com

Jonathan D. Mattingly
BARNES & THORNBURG
jmatting@btlaw.com

John W. Reale
KIRKLAND & ELLIS, LLP
jreale@kirkland.com

Avraham Noam Wagner
GLANCY & BINKOW LLP
awagner@glancylaw.com