UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FRANZ SCHLEICHER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:02-cv-1332-DFH-TAB |
| | ) | |
| GARY C. WENDT, WILLIAM J. SHEA, | ) | |
| CHARLES B. CHOKEL, and | ) | |
| JAMES S. ADAMS, | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTIONS TO DISMISS
SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

In their second amended complaint, plaintiff Franz Schleicher and others
who purchased securities issued by Conseco, Inc. have sued four senior
executives of the company for securities fraud between April 24, 2001, and August
9, 2002 (the "Class Period").  Plaintiffs dismissed their claims against Conseco
itself after the company obtained relief through bankruptcy in 2003.  Plaintiffs
accuse the individual defendants of violating sections 10(b) and 20(a) of the
Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a), by issuing false and
misleading statements to the investing community on the status of Conseco's
operations during the Class Period.  This court granted defendants' motions to
dismiss an earlier version of the complaint because the plaintiffs' allegations of
loss causation were not adequate under the standards set forth in *Dura
Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  See *Schleicher v. Wendt*,

2005 WL 1656871, at *2-5 (S.D. Ind. July 14, 2005).  The dismissal was without prejudice, and plaintiffs subsequently filed their second amended complaint, which is now before the court.  All allegations about the defendants' actions and state of mind are based on "information and belief."

Invoking the heightened pleading standards of both Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified in 15 U.S.C. § 78u-4(b), defendants have moved to dismiss plaintiffs' second amended complaint for failure to state a claim upon which relief can be granted.[1]  As explained below, the court finds that plaintiffs have adequately alleged loss causation and scienter, and have otherwise satisfied the heightened pleading requirements of the PSLRA.  Accordingly, defendants' motion to dismiss is denied.[2]

---

[1]The defendants complain that the plaintiffs' second amended complaint is excessively long, in violation of Rule 8(a) of the Federal Rules of Civil Procedure, which requires a short and plain statement of the claim showing that the pleader is entitled to relief.  The defendants cannot have it both ways.  The PSLRA's heightened pleading requirements require plaintiffs to include detailed allegations in their complaint.  In the context of these heightened pleading requirements, the plaintiffs' second amended compliant does not violate Rule 8(a).

[2]Defendants Wendt, Shea, and Chokel have filed one brief, and defendant Adams, who is involved in litigation with Conseco under its new management, has filed a separate brief.  Adams' brief raises issues specific to him but adopts and incorporates much of the other defendants' brief.  The court's decision does not depend on any differences among the four defendants.

I.   *Standards for Dismissal in Securities Fraud Cases*

In ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted, the court must assume as true all well-pleaded facts set forth in the complaint, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, No. 06-484, 551 U.S. ___, ___, 127 S. Ct. 2499, 2509 (2007).  The court must construe the allegations liberally and must draw all inferences in favor of the plaintiff.  *E.g.*, *Brown v. Budz*, 398 F.3d 904, 908-09 (7th Cir. 2005).  In an ordinary civil case, under the Federal Rules, a plaintiff pleads claims, not facts or legal theories.  See *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 923 (7th Cir. 2007) ("a judicial order dismissing a complaint because the plaintiff did not plead facts has a short half-life.").  While a complaint need not contain detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, it is not enough merely that there might be some conceivable set of facts that entitle the plaintiff to relief.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. ___, ___, 127 S. Ct. 1955, 1968-69 (2007), abrogating in part *Conley v. Gibson*, 355 U.S. 41 (1957).  Rule 8(a)(2) requires a plaintiff to state the grounds that entitle him or her to relief.  This obligation requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not suffice.  *Bell Atlantic*, 127 S. Ct. at 1964-65.  Factual allegations must be enough to raise a right to relief above the speculative level, treating the factual allegations as true.  *Id.* at 1965.  A claim may also be dismissed under Rule 12(b)(6) if it includes particulars that show the plaintiff cannot possibly be entitled to the relief

it seeks.  *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994).  The court is not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claims, nor must the court give any weight to unsupported conclusions of law. *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998).

In a private securities fraud case like this one, however, two provisions impose more exacting pleading standards than those that apply under Rule 12(b)(6).  Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff alleging fraud to allege "with particularity" the circumstances constituting fraud. *Tellabs, Inc.*, 127 S. Ct. at 2507; *In re HealthCare Compare Corp. Securities Litigation*, 75 F.3d 276, 281 (7th Cir. 1996).  This requirement means that the plaintiff must allege "the who, what, when, where, and how:  the first paragraph of any newspaper story."  *In re HealthCare Compare*, 75 F.3d at 281, quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).  Rule 9(b) allows intent, knowledge, or other states of mind to be alleged generally.  In private securities fraud cases, the PSLRA further requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

II.   *Factual Background*

In the 1980s and 1990s, Conseco grew rapidly in the insurance and financial services industries.  The company began to encounter serious financial difficulties after its $6 billion acquisition in 1998 of Green Tree Financial Corporation, which later became known as Conseco Finance.   After the acquisition, Conseco took on an additional $3.6 billion in debt to cover losses at Conseco Finance.  In April 2000, after two disastrous years, Conseco CEO Steve Hilbert and other senior executives resigned.  At that time, Conseco's stock price had fallen to $5.62 per share, meaning it had lost more than 90% of the value it had before the Green Tree acquisition.  This loss occurred before the plaintiffs in the present case made any of their investments at issue here.

In the summer of 2000, the Conseco board brought in a new management team to turn the company around.  The new team included the individual defendants in this case:  Gary C. Wendt as CEO, William J. Shea as COO and CFO, Charles B. Chokel as CFO, and James S. Adams as chief accounting officer.  The new team ultimately did not succeed in turning the company around.  On December 17, 2002, Conseco filed for Chapter 11 bankruptcy protection.

The focus in this lawsuit is on a particular 16-month period during the long slide of Conseco stock price to zero.  In early September 2000 under the new management, Conseco stock traded around $9.00 per share.  By the start of the

-5-

Class Period, on April 24, 2001, the price had risen to $16.98, and it climbed as high as $19.82 per share on May 3, 2001.  Plaintiffs seek to represent a class of those who bought Conseco stock beginning on April 24, 2001, and ending on August 9, 2002, when the company announced that it was delaying payment on some debt and had retained legal and financial advisors to help it restructure its corporate debt.  In October 2001, the stock went below $5.00 per share.  It never went above that level again.  On August 9, 2002, the last day of the Class Period, the stock price declined from 34 cents per share to about 11 cents per share.  On August 12th, the New York Stock Exchange halted trading in Conseco stock.  The stock continued to trade on "pink sheets" for a few cents per share, but lost all value in the bankruptcy proceeding filed in December 2002.  The bankruptcy resulted in discharge of all of the claims asserted in this case against Conseco itself.

During the Class Period, Conseco management issued a series of public statements and filed reports with the SEC to inform investors about Conseco's business and the state of their turnaround efforts.  CEO Wendt issued a series of "Turnaround Memos."  All acknowledged that the company faced substantial challenges in recovering from the Green Tree acquisition and other earlier mistakes.[3]

---

[3]At this stage of the case, the court may consider such documents that were referenced in the complaint or that are the subject of judicial notice.  See *Tellabs, Inc.*, 127 S. Ct. at 2509.

Although the public statements shared a great deal of bad news with investors, plaintiffs allege that the defendants deliberately or recklessly misled investors by misrepresenting or failing to disclose eight critical aspects of the company's finances and operations:

    1.    Undisclosed guaranty obligations of $900 million on so-called "B-2"certificates that Conseco Finance pledged as collateral for its credit facility with Lehman Brothers, combined with accounting that treated Conseco's payments to itself as operating income.

    2.    Undisclosed operating deficit from inadequate loan servicing fees.

    3.    Undisclosed $2 billion loss contingency arising from poor documentation on non-conforming consumer loans sold to securitization trusts.

    4.    Failure to write down the value of interest-only securities as projected cash flows and interest rates dropped.

    5.    Distorted delinquency rates for the company's loans to consumers through the improper and excessive use of loss mitigation tactics.

    6.    Failure to adhere to published credit quality standards for consumer loans.

    7.    Undisclosed losses from Conseco's guarantees of massive loans to Conseco's own directors and officers under the Hilbert regime.

    8.    Failure to include the director and officer loans in debt repayment plans, with the effect of misrepresenting the company's viability.

The second amended complaint is lengthy and detailed.  It is 211 pages long with 318 separate paragraphs.  It defies summary.

III.    *Discussion*

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Rule 10b-5 of the Securities and Exchange Commission specifies the following actions among the types of behavior proscribed by the statute:  "To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . . ."  17 C.F.R. § 240.10b-5.

To state a claim for securities fraud under section 10(b), a plaintiff must allege that the defendant (1) made a misstatement or omission (2) of material fact (3) with fraudulent intent ("scienter"), (4) in connection with the purchase or sale of securities (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiffs' injuries.  *In re HealthCare Compare Corp. Securities Litigation*, 75 F.3d 276, 280 (7th Cir. 1996); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995); 17 C.F.R. § 240.10b-5.

Defendants argue that the second amended complaint should be dismissed, with prejudice this time, for these principal reasons:  (1) failure to correct earlier problems with loss causation; (2) failure to plead facts giving rise to a strong

inference of scienter; and (3) failure to plead a basis for control person liability under § 20(a).

A.   *Loss Causation*

To state a viable section 10(b) claim, a plaintiff must allege loss causation: that "the act or omission of the defendant alleged to violate [section 10(b)] caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4); *see also Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir. 1990) (requiring plaintiff to show that "but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains").[4]

The requirement of loss causation "ought not be construed as a metaphysical term, but rather as a practical requirement."  *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997), citing *Rankow v. First Chicago Corp.*, 870 F.2d 356, 367 (7th Cir. 1989).   The requirement of loss causation:

> ought not place unrealistic burdens on the plaintiff at the initial pleading
> stage.  It does not require, for instance, that the plaintiff plead that all of its
> loss can be attributed to the false statement of the defendant.  Such a

---

[4]It is also necessary, but not sufficient, that a plaintiff allege transaction causation, meaning that the plaintiff relied upon the misrepresentation in buying the artificially inflated stock. *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007).  "Such an assertion alleges transaction causation, but it does not allege loss causation.  Rather, it is also necessary to allege that, but for the circumstances that the fraud concealed, the investment . . . would not have lost its value." *Id.* (internal quotation marks omitted).  Transaction causation is not at issue on defendants' motions to dismiss.

burden would be far more stringent than the common law tort requirement upon which the requirement is based and would impose a burden on the plaintiff specifically forbidden by our case law.  Nor does the requirement of pleading loss causation require that the plaintiff allege that it could not have suffered the same damage under other circumstances.  Rather, the requirement is straightforward:  The plaintiff must allege that it was in fact injured by the misstatement or omission of which it complains.

*Id.*  (internal citation omitted).

In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342-46 (2005), the Supreme Court addressed and further clarified the requirement of loss causation. In *Dura Pharmaceuticals*, the Ninth Circuit had held that a plaintiff adequately alleged loss causation by alleging that the defendants' misrepresentation caused the market price of the security to be artificially inflated when the plaintiff bought it.  The Supreme Court reversed, holding unanimously that more was required.

The issue in *Dura Pharmaceuticals* was whether plaintiffs could pursue a claim that the defendants falsely claimed that a new spray device for treating asthma would receive FDA approval.  At the close of the class purchase period, the defendant's stock price fell dramatically for other reasons.  Not until eight months after the close of the class period did the defendant announce that the FDA had not approved the new spray device.  Defendants argued that the timing meant that the alleged misrepresentation concerning the spray device could not possibly have caused any loss to the plaintiffs.

Plaintiffs pursued the securities fraud claim on the theory that the defendants' false predictions for the spray device had artificially inflated the stock price above an honest price during the period when they bought the stock. The problem lay in the timing of the relevant disclosure. The key allegation missing from the complaint, in the Supreme Court's view, was an allegation "that Dura's share price fell significantly after the truth became known." 544 U.S. at 347. The absence of such an allegation, wrote the Court, "suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient." *Id.* The Court went on to affirm the district court's dismissal of the relevant claims in the complaint because it did not allege loss causation with respect to the alleged misrepresentations concerning the spray device. The complaint needed to give the defendants notice of the alleged economic loss and the alleged causal connection between the loss and the relevant misrepresentation. *Id.* In this case, the earlier version of the plaintiffs' complaint failed because it did not allege loss causation adequately under the standards set forth in *Dura Pharmaceuticals.* See *Schleicher v. Wendt*, 2005 WL 1656871 (S.D. Ind. July 14, 2005).

In support of their second amended complaint, plaintiffs argue that while *Dura Pharmaceuticals* rejected the Ninth Circuit's interpretation of the loss causation standard, it did not establish a new standard in its place, leaving much of the existing law on loss causation intact. The plaintiffs now argue loss causation under a "materialization of the risk" theory. Defendants, on the other hand, argue that "materialization of the risk" is "meaningless terminology."

The Seventh Circuit recently addressed loss causation as interpreted in *Dura Pharmaceuticals*. In *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991 (7th Cir. 2007), the court noted that it had made the same point as *Dura Pharmaceuticals* years before in *Bastian v. Petren Resources Corp.*, 892 F.2d 680 (7th Cir. 1990): "'what securities lawyers call loss causation *is* the standard common law fraud rule . . . merely borrowed for use in federal securities fraud cases.'" *Ray*, 482 F.3d at 995, quoting *Bastian*, 892 F.2d at 683. The court added:

> There are several ways in which a plaintiff might go about proving loss causation. The first is sometimes called the "materialization of risk" standard. . . . The second approach is the "fraud-on-the-market" scenario, which the Supreme Court discussed in *Dura*. Under that theory, plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception. Finally, *Bastian* suggests that loss causation might be shown if a broker falsely assures the plaintiff that a particular investment is "risk-free."

*Id.* The court did not apply the materialization of the risk approach in resolving the issues in *Ray*, instead finding that the "approach that comes closest to satisfying plaintiffs' burden is the 'risk-free' idea." *Id.* at 996. However, its inclusion of the materialization of the risk approach in its list of acceptable methods of proving loss causation indicates that the court considers the approach to have survived *Dura Pharmaceuticals*.

Other federal courts have agreed that *Dura Pharmaceuticals* left much of the prior Seventh Circuit law intact.  See, *e.g.*, *In re Motorola Securities Litigation*, 2007 WL 487738, at *26 (N.D. Ill. Feb. 8, 2007) (finding that *Dura Pharmaceuticals* held "that a plaintiff must prove loss causation, and cannot do so merely by showing that the share price was artificially inflated at the time of purchase; but the Court did not address *how* a plaintiff could prove loss causation"); *Lawrence E. Jaffe Pension Plan v. Household International, Inc.*, 2006 WL 1120522, at *3 (N.D. Ill. Apr. 24, 2006) (rejecting defendants' argument that *Dura Pharmaceuticals* changed Seventh Circuit pleading standards with regard to loss causation:  "The *Dura* Court noted that the Seventh Circuit had already rejected the Ninth Circuit's approach to alleging loss causation. . . . Thus, *Dura* did not change the controlling law in this circuit."); *In re Enron Corp. Securities Litigation*, 439 F. Supp. 2d 692, 703 (S.D. Tex. 2006) (finding that *Dura Pharmaceuticals* did not address and thus left intact more stringent requirements established by Seventh Circuit and other circuits); *In re Initial Public Offering Securities Litigation*, 399 F. Supp. 2d 298, 301 (S.D.N.Y. 2005) ("*Dura* did not establish what *would* be a sufficient loss causation pleading standard; it merely established what was *not*. . . . The Court did not explicitly modify the stricter standards of [the Second, Third, Seventh and Eleventh] Circuits when it rejected the Ninth Circuit's lenient standard.").  Hence, as the Seventh Circuit recently made clear in *Ray*, the "materialization of the risk" approach still appears to be a viable approach to alleging loss causation in the Seventh Circuit.

-13-

Under the materialization of the risk approach, a plaintiff must show that the defendant exposed him to an undisclosed risk that subsequently materialized and that the materialization of this risk resulted in the complained of loss.  See *Caremark*, 113 F.3d at 648 ("To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries."); *Bastian*, 892 F.2d at 685-86; see generally D. Escoffery, *A Winning Approach to Loss Causation Under Rule 10b-5 in Light of the Private Securities Litigation Reform Act of 1995*, 68 Fordham L. Rev. 1781, 1803-06, 1815-24 (2000) (describing the Seventh Circuit as the "principal proponent" of the materialization of the risk approach to loss causation under the PSLRA and arguing that it is the "winning approach" among several).

The typical PSLRA plaintiff shows loss causation by first showing that a company's stock price was artificially inflated when fraudulently rosy information was released to the public, and by then showing that a drop in the stock price followed shortly after the truthful bad news was released to the market.  *Dura Pharmaceuticals* established that in this typical sort of case, which the Court called a "fraud-on-the-market case," 544 U.S. at 342, the plaintiff must show that the loss occurred *after* the revelation of the truth.  The Court left open, however, the exact mechanism by which the truth could become known to the market, suggesting that a *mea culpa* announcement by the company was not the only way. The Court explained:  "But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to

any loss." *Id.* The phrase "leak out" suggests that the bad news could be revealed to the market in a less obvious, piecemeal way. See also *In re Tyco International, Ltd.*, 2004 WL 2348315, at *14 (D.N.H. Oct. 14, 2004) (denying motion to dismiss where complaint alleged that company's "stock price declined in part because investors concluded that they could no longer credit the company's denials of accounting misconduct").

In this case, the plaintiffs' materialization of the risk theory is a method of showing loss causation without having to show the typical drop in stock price following a *mea culpa* announcement by the company. By way of example, the theory works essentially like this: a company misrepresents that it will have substantial income in the next quarter because of a new contract it landed, when the contract is fictitious. The announcement causes the company's stock price to rise artificially. The promised income, however, never materializes and this produces risks – risks, for example that the company will not be able to cover required loan payments or other costs. When the company cannot make those payments, then the risk is said to have materialized. The company's stock price drops because the market knows of the company's inability to pay on its loans, even if it does not yet know of the underlying fraudulent reason for the lack of income. The materialization of the risk created by the fraud, then, has caused the company's stock to drop in value. But for the fraud, says the theory, the plaintiffs would not have suffered loss when the artificially inflated stock lost value.

In this case, as this court noted in its previous opinion, the truth about matters that plaintiffs allege were concealed or misrepresented did not come out publicly until months after the end of the Class Period, even during the bankruptcy litigation itself.  This is not a case where plaintiffs can point to a sharp drop in the company's stock price following announcement of the allegedly concealed truth.   The stock had long since hit bottom before the alleged misrepresentations became known.  Instead, the plaintiffs now allege and argue that the materialization of risks that were not disclosed caused a decline in the value of the stock in the slide toward bankruptcy.

This theory is similar to that in *In re Parmalat Securities Litigation*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005), where the defendants issued public statements that overstated Parmalat's consolidated shareholder equity by more than $8 billion and overstated earnings by at least $538 million.  The alleged misrepresentations concealed the risk of Parmalat's massive undisclosed debt and its inability to service that debt.   Plaintiffs alleged that the concealed risk materialized when Parmalat suffered a liquidity crisis and was unable to pay bonds as they came due.  Parmalat's shares lost almost one-half of their value as a result.   The court recognized that although an allegation that a corrective disclosure caused the plaintiff's loss may be sufficient to satisfy the loss causation requirement, such an allegation is not necessary under a materialization of the risk theory.  *Id.* at 305-06.  In denying the defendants' motion to dismiss, the court said: "That the true extent of the fraud was not revealed to the public until

February – after Parmalat shares were worthless and after the close of the Class Period – is immaterial where, as here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline in shareholder and bondholder value." *Id.* at 307.

Even after *Dura Pharmaceuticals*, the PSLRA's heightened particularity requirement does not extend to the pleading of the elements of economic loss and proximate causation. Although the PSLRA requires a plaintiff to "allege and prove the traditional elements of causation and loss" for a securities fraud claim, neither the Federal Rules of Civil Procedure nor the PSLRA impose more than the requirement set forth in Rule 8(a)(2): "a short and plain statement of the claim showing that the pleader is entitled to relief." See *Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 742-43 (N.D. Ill. 2006) (rejecting defendant's argument that *Dura Pharmaceuticals* imposed stricter fact-pleading requirements for the economic loss and causation elements of an action under § 10(b) and collecting cases finding likewise).

As noted, during the Class Period, Conseco management issued a series of public statements that shared a great deal of bad news with investors. The record of Conseco's public statements and SEC filings during the attempted turnaround is replete with bad news. Effective January 1, 2002, Conseco wrote off approximately $2.9 billion in goodwill. In May 2002, Moody's downgraded Conseco's senior debt rating from "B-2" to "Caa1." In July 2002, A.M. Best

downgraded the financial strength rating for the company's insurance subsidiaries.  In the third quarter of 2002, Conseco realized nearly $500 million in losses in its investment portfolio.  Each of these disclosures led to sharp drops in Conseco's stock value.  Moreover, the company's stock had already lost 90% of its earlier peak value before the plaintiffs in the present case made any of their investments at issue here.  All of plaintiffs' investments during the Class Period can fairly be described as speculative investments in a company already known to be in deep trouble.

At later stages of the case, loss causation is likely to present a very complex problem, as a factual matter.  Plaintiffs have alleged fraud with respect to eight major topics in a host of public filings and statements over sixteen months.  During those same sixteen months, many other *disclosed* factors clearly contributed to the further erosion of Conseco share prices.  At the pleading stage of the case, however, plaintiffs have alleged enough in the second amended complaint to survive a motion to dismiss on this basis, as explained in detail below.

B.    *Fraudulent Scienter*

A plaintiff must also allege that the defendants made the statements with "scienter."  Scienter, as applied to securities fraud claims, refers to "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder,*

425 U.S. 185, 193 n.12 (1976); see 15 U.S.C. § 78u-4(b)(2).  In the Seventh

Circuit, reckless disregard for the truth is sufficient to meet the scienter

requirement.   In the context of securities fraud claims, the Seventh Circuit

describes "reckless conduct" as

> a highly unreasonable omission, involving not merely simple, or even
> inexcusable negligence, but an extreme departure from the standards of
> ordinary care, and which presents a danger of misleading buyers or sellers
> that is either known to the defendant or is so obvious that the actor must
> have been aware of it.

*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977); see

also *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977) ("In view of

the Supreme Court's analysis in *Hochfelder* of the statutory scheme of implied

private remedies and express remedies, the definition of 'reckless behavior' should

not be a liberal one lest any discernible distinction between 'scienter' and

'negligence' be obliterated for these purposes.").[5]  The combination of Rule 9(b) of

the Federal Rules of Civil Procedure and the Private Securities Litigation Reform

Act of 1995 (PSLRA) has raised the bar plaintiffs must clear at the outset of

private actions alleging securities fraud.

---

[5]The issue of whether reckless behavior is sufficient for civil liability under
§ 10(b) and Rule 10b-5 was not before the Supreme Court in *Tellabs, Inc.*  The
Court noted:  "Every Court of Appeals that has considered the issue has held that
a plaintiff may meet the scienter requirement by showing that the defendant acted
intentionally or recklessly, though the Circuits differ on the degree of recklessness
required."  127 S. Ct. at 2507, n.3.

Rule 9(b) requires that when fraud is alleged in a complaint, "the circumstances constituting fraud . . . shall be stated with particularity." The heightened pleading requirement in fraud cases is designed to force the plaintiff to do more than the usual investigation before filing his complaint. *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

Rule 9(b) also provides that a defendant's state of mind "may be averred generally." However, even before passage of the PSLRA, a complaint alleging securities fraud still had to "afford a basis for believing that plaintiffs could prove scienter." *In re HealthCare Compare*, 75 F.3d at 281, quoting *DiLeo*, 901 F.2d at 629; accord, *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir. 1990). Rote conclusions that a defendant knew statements were false and misleading have always been insufficient. See *Robin*, 915 F.2d at 1127; see also *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196-97 (1st Cir. 1999) (noting that pre-PSLRA cases from the First Circuit at the motion to dismiss stage required allegations to raise at least a "reasonable inference" of scienter).

The PSLRA raised the pleading standard in private securities fraud cases even higher, especially with respect to allegations of fraudulent scienter and allegations based only on "information and belief." As amended by the PSLRA, the law now provides:

> (b) (1) In any private action arising under this chapter in which the plaintiff alleges that the defendant –

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2)    In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

(3)    (A)    In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

15 U.S.C. § 78u-4(b) (emphasis added).

The heightened pleading requirements in § 78u-4(b) further increase plaintiffs' pre-complaint duty to investigate and further discourage claims of so-called "fraud by hindsight." See *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (using term where plaintiff had "simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones"); see also, *e.g.*, *In re Carter-Wallace, Inc., Securities Litigation*, 220 F.3d 36, 42-43 (2d Cir. 2000) (affirming judgment on the pleadings for defendants); *In re Advanta Corp. Securities Litigation*, 180 F.3d 525, 537-41 (3d Cir. 1999) (affirming dismissal for failure to state a claim); *Arazie v. Mullane*, 2 F.3d 1456, 1467-68 (7th

Cir. 1993) ("fraud by hindsight" is not actionable; temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudulent).

Section 78u-4(b) requires a court to dismiss a complaint that fails to (1) identify each of the allegedly material, misleading statements, (2) state facts that provide a basis for allegations made on information and belief, or (3) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Some courts have described the requirement of pleading facts giving rise to a "strong inference" of scienter as the most salient feature of the PSLRA. See, *e.g.*, *Greebel*, 194 F.3d at 196. Another significant component of the PSLRA is its explicit protection for "forward-looking statements." See 15 U.S.C. § 78u-5 (defining term and setting forth the statutory safe harbors); see also *In re Comshare, Inc. Securities Litigation*, 183 F.3d 542, 549 & n.5 (6th Cir. 1999) (noting that the PSLRA requires plaintiffs to allege facts that raise a strong inference that the defendants had actual knowledge of a forward-looking statement's falsity).

Congress passed the PSLRA in response to perceived abuses in which issuers of securities would be sued based on little more than a significant drop in their stock prices after announcing bad news. See *Tellabs, Inc.*, 127 S. Ct. at 2504, 2508; *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) ("Legislators were

apparently motivated in large part by a perceived need to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries."), citing H.R. Conf. Rep. No. 104-369, at 31 (1995) (noting "significant evidence of abuse in private securities lawsuits," including "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer," and "the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle"), reprinted in 1995 U.S.C.C.A.N. 730, 730.

Addressing the meaning of the PSLRA's "strong inference" language, the Supreme Court has reminded lower courts of "the PSLRA's twin goals:  to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc.*, 127 S. Ct. at 2509.  The Court reiterated that the "securities statutes seek to maintain public confidence in the marketplace [and] . . . do so by deterring fraud, in part, through the availability of private securities fraud actions." *Id.*, at 2507, quoting *Dura Pharmaceuticals*, 544 U.S. at 345.  The Court further noted:  "Nothing in the [PSLRA] . . . casts doubt on the conclusion 'that private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses' – a matter crucial to the integrity of domestic capital markets."  127 S. Ct. at 2508 n.4, quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81 (2006).

At issue in *Tellabs* was the standard courts should apply to determine whether a securities fraud complaint adequately alleges a "strong inference" that a defendant acted with the required fraudulent intent.  The Seventh Circuit had held that the "strong inference" standard would be met if the complaint alleged "facts from which, if true, a reasonable person could infer that the defendant acted with the required intent."  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602 (7th Cir. 2006).  The Supreme Court reversed and remanded, holding that an inference that a defendant acted with scienter must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc.*, 127 S. Ct. at 2504-05. "[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, as the Seventh Circuit did, but also competing inferences rationally drawn from the facts alleged."  *Id.* at 2504.  However, the "inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id.* at 2510, quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004).

The Court further stated in *Tellabs* that in evaluating whether the PSLRA's pleading standard is met, courts must consider the complaint in its entirety.  "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a

strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509.

> We reiterate . . . that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. . . . In sum, the reviewing court must ask:  When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

*Id.* at 2511.  For example, the absence of a motive allegation is not fatal because allegations must be considered collectively and "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Id.* at 2511.

Many factors can be relevant in evaluating allegations of scienter depending on the circumstances.  The following factors are relevant here.  No one factor is necessarily conclusive in isolation, but they can provide direct or circumstantial evidence of scienter.

(a)    Materiality and scale. *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 234 (D. Mass. 1999)  ("Courts have held that significant overstatements of revenue 'tend to support the conclusion that the defendants acted with scienter.'"), quoting *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 (C.D. Cal. 1996), and citing *Rehm v. Eagle Financial Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997), and *In re Miller Industries, Inc. Sec. Litig.*, 12 F. Supp. 2d 1323, 1332 (N.D. Ga. 1998).  Cf. *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 851

(N.D. Ill. 2003) (dismissing claims based on alleged GAAP violation that allegedly inflated reported earnings by less than three percent; small scale did not support inference of scienter; collecting cases and distinguishing *Chalverus* based on scale of alleged effects).

(b)     Violation of GAAP and/or a company's own accounting policies.  See *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000); *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 624-625 (E.D. Va. 2000); *Chalverus*, 59 F. Supp. 2d at 235 ("Courts have held that violation of a company's own policy supports an inference of scienter."), citing *Provenz*, 102 F.3d at 1490; *Van de Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 735 (D. Mass. 1995); *In re The Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21-22 (D.D.C. 2000) (violating stated policy is evidence of conscious choice).  This is not to say that either a violation of a policy by itself or a failure to comply with generally accepted accounting principles (GAAP) by itself is enough to show a violation of securities law.  See, *e.g.*, *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 699 (E.D. Pa. 2001); see also *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1458 (N.D. Cal. 1996) ("there can be no claim of fraud based merely on a company's deviation from its own undisclosed internal accounting practices"). Rather, these are factors that may tend to support an inference of scienter as part of the court's evaluation of the complaint as a whole, as required under *Tellabs*.  See, *e.g.*,

*Novak*, 216 F.3d at 309; *In re Digi International, Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1098-99 (D. Minn. 1998), and cases cited therein.

(c)    Existence of a prior action alleging the same fraudulent manipulations. *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 15 (D. Mass. 2000) (plaintiffs' strongest argument was that defendants had engaged in the same improper accounting practices during the class period at issue that were utilized during the earlier class period that had been the subject of a separate securities fraud case; assertion was strongly probative of scienter because defendants were on notice of the improper accounting practices giving rise to earlier securities fraud case.

(d)    Affirmative misrepresentations where the defendants either knew or had access to information showing that their public statements were not accurate. See, *e.g.*, *Florida State Bd. of Administration v. Green Tree Financial Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate."), citing *Novak v. Kasaks*, 216 F.3d at 311.

(e)    Confidential witnesses, where the complaint quotes or summarizes information from unidentified witnesses who have personal knowledge of facts that show scienter.   "[W]hile witnesses need not be named, they must be

'described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *City of Austin Police Retirement System v. ITT Educational Services, Inc.*, 388 F. Supp. 2d 932, 942 (S.D. Ind. 2005), quoting *Novak v. Kasaks*, 216 F.3d at 314. In *Higginbotham v. Baxter International, Inc.*, — F.3d —, —, 2007 WL 2142298, *2-3 (7th Cir. July 27, 2007), the Seventh Circuit said that information from anonymous sources must be "discounted," though not necessarily "ignored," in evaluating the pleading of scienter.  In this case, plaintiffs have included specific details about identities and bases of knowledge that tend to support inferences of scienter, as the Second Circuit allowed in *Novak*.  See 216 F.3d at 313 (reversing dismissal:  "our reading of the PSLRA rejects any notion that confidential sources must be named as a general matter").  In addition, plaintiffs in this case have not relied solely on such (temporarily) confidential witnesses, but have used such witnesses to corroborate information from other sources.

To survive a motion to dismiss, plaintiffs are not required to show that the defendants had any special motive to commit fraud.  See *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1269 (N.D. Cal. 2000) ("A motive for fraud, such as personal gain, is not a required element of scienter or of fraud in general."), citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).  On the other hand, plaintiffs cannot adequately allege scienter based merely upon factors that would be true for nearly all corporate executives.  See *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("Plaintiffs' allegation that defendants were

motivated to defraud the public because an inflated stock price would increase their compensation is without merit.  If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1250 (M.D. Fla. 2002) (allegation that defendants fraudulently inflated the stock price to benefit the company "has no force since it would seem to apply to just about every case"); *In re Brightpoint, Inc. Securities Litigation*, 2001 WL 395752, *13-14 (S.D. Ind. 2001).

C.      *Application of Pleading Standards to the Second Amended Complaint*

For purposes of applying the pleading standards of the PSLRA, the court has assessed the plaintiffs' claims in light of the complaint as a whole to determine whether the allegations meet the specificity requirements of Rule 9(b) and § 78u-4(b)(1), whether the allegations raise a "strong inference" of scienter under § 78u-4(b)(2), and whether the allegations satisfy the loss causation requirements of § 78u-4(b)(4).  The court first sets forth each of the topics of the allegedly misleading misstatements and omissions, and then applies the requirements of the PSLRA.

1.      *Undisclosed $900 Million In Guaranty Obligations*

a.      *Loss Causation and the B-2 Certificates*

The plaintiffs claim that the defendants failed to disclose $900 million in guarantee liability attached to subordinated debt securities called B-2 Certificates retained by Conseco Finance.  In SEC filings throughout the Class Period, the defendants affirmatively stated that Conseco's guarantee liability was $1.4 billion, but the actual liability was $2.3 billion.  The B-2 Certificates, ordinarily sold to third parties, were retained by Conseco but pledged as collateral to secure a half-billion dollar loan from Lehman Brothers.  This additional $900 million in liability did not come to light until Conseco's bankruptcy proceedings in December 2002.  Prior to the bankruptcy, Conseco had disclosed the guarantee liability only for the B-2 Certificates sold to unrelated third party investors.  Plaintiffs claim, however, that the risks associated with the undisclosed liability materialized during the Class Period and caused a decline in the value of the securities at issue.  See SAC ¶¶ 42-78.

During the Class Period, defendants emphasized operating income as the true measure of Conseco's performance.  Numerous "turnaround" memos from management to Conseco shareholders emphasized operating earnings.  Throughout the Class Period, Conseco's new management team touted its allegedly strong cash flows.  Much of this reported cash flow was illusory, say plaintiffs, because it came from the retained B-2 Certificates.  Conseco was forced to pay securitization trusts in the form of guarantee payments when it did not receive cash from customer loan payments.  However, the trusts disbursed that cash back to Conseco as payments on their retained B-2 Certificates.  Conseco

then counted these payments, essentially payments by Conseco to itself, as "income" even though there was no net gain from such payments.  Conseco Finance's "primary source of working capital" was the cash generated by these retained Certificates; in 2001, these payments constituted between 11 percent and 67 percent of Conseco Finance's "operating" income.  Plaintiffs complain that Conseco did not disclose the "incestuous and fictitious" nature of this operating income as required by SEC regulation 17 C.F.R. § 229.303(3)(i) (requiring disclosure of "any unusual . . . transactions . . . that materially affected the amount of reported income").   SAC ¶ 60.

Plaintiffs allege that the defendants employed improper and misleading accounting methods to embed the expenses from the B-2 Certificate guarantees in reports on Conseco's interest-only securities, enabling Conseco to hide from investors the actual amount of liabilities arising from the guarantees.  SAC ¶¶ 55-78.  Plaintiffs also claim that the B-2 Certificate guarantees, including those held by Lehman Brothers, were a primary factor in Conseco's "liquidity crisis" leading to its bankruptcy.  In its bankruptcy disclosure statement, Conseco acknowledged that "payment of the guarantees for the B-2 Certificates represents a major obligation of Conseco Finance, and in the fourth quarter of 2002, Conseco Finance suspended its payments on the guarantees of B-2 Certificates."  Plaintiffs allege that Conseco's financial statements were materially misleading because investors were not informed of the liquidity risk associated with the undisclosed $900 million in guarantee liability.

The plaintiffs claim that the risk associated with the undisclosed $900 million in guaranty obligations first materialized on January 3, 2002 when Solomon Smith Barney analyst Colin Devine predicted that such guarantee payments in 2002 would be more than double the $50-60 million that defendants had recently projected at an analysts' conference.[6]   Further, the cash flow risks from the undisclosed guarantee liability were demonstrated in the third quarter of 2002 when Lehman Brothers asserted that there was a collateral deficit on the pledged assets and began retaining the cash flows from the assets.   Plaintiffs claim that this deficit ultimately led defendants to suspend payments on the B-2 Certificate guarantees in the fourth quarter of 2002.

The plaintiffs' "materialization of the risk" theory is essentially this:   the undisclosed $900 million in guaranty obligations, kept secret by misleading accounting techniques that hid the amount of the liability from investors, and further hidden by the fictitious nature of the operating income from the retained certificates, created problems in other areas that eventually surfaced and caused

_____

[6]The reports and recommendations that investment analysts and rating services issue can be very influential.  Investors rely upon these ratings in making investment decisions.  Analysts are an important medium for bringing corporate information and insight to the market, and an analyst's downgrade can have direct and serious effects on a security's value.  It is in this sense that a change in a security's rating can count as a new fact for the market.  Defendants seem to be conveniently of two minds when it comes to analyst reports.  On the one hand, defendants argue that the information released to the public through analysts is as good as if Conseco had released the information itself.  On the other hand, defendants argue that information coming from analysts in the form of a downgrade cannot count as "new, previously unknown, company information."  Defendants cannot have it both ways, and they might not be entitled to the benefit of either of these preferred interpretations, at least at the pleading stage.

the company's value to decline.[7]   Hence, even if the details of the defendants'
specific deceptions regarding the guarantees were not revealed until the
bankruptcy, plaintiffs allege, their misstatements and omissions still proximately
caused the decline because they created risks that then materialized with
disastrous effects.

        b.     *Scienter and the B-2 Certificates*

Plaintiffs argue that the defendants' statements concerning the B-2
Certificate guarantee liability and payments constitute affirmative
misrepresentations that establish scienter.  They argue that the very magnitude
of the omissions is evidence of defendants' recklessness.  "Officers of a company
can be assumed to know of facts 'critical to a business's core operations or to an
important transaction that would affect a company's performance.'"  *In re Sears,
Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (denying
motion to dismiss securities fraud claims based on retailer's major credit card
initiative), quoting *Stavros v. Exelon Corp.*, 266 F. Supp. 2d at 850 (granting
motion to dismiss where fraud allegations concerned minor and marginal portions
of business); *In re Peoplesoft, Inc. Sec. Litig.*, 2000 WL 1737936, *3-4 (N.D. Cal.
2000) (scienter alleged sufficiently in part where it was reasonable to assume
senior management knew of "loss of major customers and massive defects in their
flagship products").  Plaintiffs allege that defendants repeatedly touted Conseco's

---

[7]See SAC ¶¶ 245, 247, 249, 252, 255, 257, 261, 310.

alleged strong cash flows, including cash paid to Conseco by Conseco Finance, because they were critical to Conseco's survival.   But defendants were purposefully inflating cash flow artificially.  The defendants emphasized operating income as an important measure of the company's potential for a successful turnaround.   According to plaintiffs, the defendants' improper accounting treatment of the guarantee payments benefitted Conseco by allowing it to report operating investment income from receipt of the guarantee payments on the B-2 Certificates without reporting any offsetting operating expense when the guarantees were paid.

2.   *Other Allegations Related to Manufactured Housing Business*

Most of the plaintiffs' other allegations of fraud similarly relate to Conseco's manufactured housing loan portfolio.  In addition to the allegations discussed above concerning the undisclosed guarantee liabilities, plaintiffs allege that defendants:   misrepresented servicing fees and related servicing rights for manufactured-housing receivables (SAC ¶¶ 79-84); failed to disclose or accrue a $2 billion contingency for "exception" loans (SAC ¶¶ 96-105); failed to timely write-down the carrying value of interest-only securities (SAC ¶¶ 77, 106-16); distorted delinquency rates through the improper and excessive use of loss mitigation tactics (SAC ¶¶ 117-35); and failed to adhere to publicly stated credit quality standards (SAC ¶¶ 136-48).

a.    *Loss Causation and the Manufactured Housing Issues*

As with the undisclosed $900 million in guarantee obligations, plaintiffs argue loss causation under a materialization of the risk theory.  Plaintiffs argue that the misstatements and omissions related to Conseco's manufactured housing business posed risks that then materialized and caused the value of the securities at issue to go down.  Specifically, plaintiffs allege that the misstatements and omissions posed risks in the form of liquidity and cash-flow problems,[8] exposure to credit risk,[9] exposure to losses due to overvaluation of interest-only securities,[10] and that the risks imperiled Conseco's ability to restructure debt.[11]

Plaintiffs allege that events occurred throughout the Class Period which either revealed or constituted the materialization of the fraud's risks, which then caused Conseco's stock price to decline.  For example, plaintiffs argue that the defendants' misstatements concerning Conseco Finance obscured the risk of poor credit quality and that this risk began to materialize on November 21, 2001, when Fitch Ratings, an international credit rating agency, downgraded Conseco due to "deteriorating credit quality."  Plaintiffs argue that this downgrade (and there were others) significantly affected investor views of Conseco's worth – even without

---

[8]See SAC ¶¶ 54, 56, 60, 72, 74 & n.11, 77, 80, 83, 90, 94, 126, 133(c)(i), 185, 196, 198(a), 204, 213, 215, 225(a).

[9]See SAC ¶¶ 42 n.7, 74, 105, 117, 125, 126(c), 133(c), 139(c), 143, 146.

[10]See SAC ¶ 78.

[11]See SAC ¶ 105.

revelation of the true, specific nature of the defendants' fraud.  Plaintiffs further argue that the Fitch report was a materialization of all of the credit risk fraud at Conseco Finance – including manipulation of interest-only values and B-2 guarantee liabilities and inadequate servicing fees – because the fraud was perpetrated precisely to obscure deteriorating credit quality, which caused both massive cash servicing outflows and huge principal and interest deficits.  Plaintiffs allege that the Fitch downgrades quickly caused a statistically significant abnormal negative return on Conseco's stock price.[12]

As another example of the materialization of the risk created by the fraud surrounding Conseco's manufactured housing business, plaintiffs cite Solomon Smith Barney's analyst Colin Devine issuance of a report downgrading Conseco's stock from "underperform" to "sell."  Plaintiffs claim that on January 3, 2002, Devine exposed Conseco Finance's "eroding credit quality."  Using data from Conseco rival Greenpoint, Devine uncovered erroneous loan loss assumptions used by Conseco that understated projected guarantee payments and overstated the values of interest-only securities.  Plaintiffs claim that entry of this new information into the market quickly caused a statistically significant abnormal

---

[12]Abnormal returns are the difference between the expected return on a security, taking into account its volatility, and the actual return.  A statistically significant abnormal return may indicate that something fishy is causing the value of the security to deviate from its expected value.  For example, abnormal positive returns could be the result of insider trading.  Abnormal negative returns could be the result of fraud.  On a motion to dismiss, the court takes as true the plaintiffs' claim that their analysis has revealed statistically significant abnormal negative returns.

negative return on Conseco's stock price resulting from the alleged fraudulent statements.

        b.    *Scienter and the Manufactured Housing Issues*

Plaintiffs argue that each defendant acted recklessly with regard to the above enumerated misstatements in a manner sufficient to establish scienter.

For example, plaintiffs argue that the defendants' affirmative misstatements of delinquency ratios and credit quality standards in press releases, quarterly earnings releases, and SEC filings are sufficient to establish scienter.  They argue that defendants' recklessness is shown by their systematic violation of their own policies and false reporting in violation of generally accepted accounting principles (GAAP) to hide the risks (and the ensuing losses) enumerated above.  Plaintiffs further argue that defendants' recklessness is established because all of the defendants "published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Green Tree Financial Corp.*, 270 F.3d at 665 (one of the "classic fact patterns giving rise to a strong inference of scienter").[13]

Plaintiffs further allege that defendants were reckless in their reporting of Conseco's operating deficit caused by receiving inadequate fees for servicing

---

[13]The case involved the same Green Tree that Conseco later acquired with such disastrous effects.

Conseco Finance's managed receivables.  Plaintiffs list four ways that defendants misleadingly presented servicing fee information in Conseco's public filings:

> First, "Servicing Rights" went from being a balance sheet line item . . . to being a part of the interest-only securities footnote.  Second, defendants reported servicing fees and interest-only [securities] together, netting them even though the assumptions as to their value differ.  Third, defendants' presentation combined servicing expenses with general operating expenses to imply that they were decreasing – when they were not.  Fourth, even though Conseco adopted [Statement of Financial Accounting Standards No. 140], defendants failed to provide four categories of information required for investors to better estimate the ongoing and future value of servicing rights.

Pl. Br. 24 (Docket No. 178).  Without going into detail, the court notes two other arguments plaintiffs make to support scienter:  first, that the defendants were reckless in their failure to account for a $2 billion loss contingency with respect to non-conforming loans transferred to securitization trusts, and second, that defendants were reckless in their failure to write down the value of interest-only securities.

### 3.    *Undisclosed Director and Officer Loan Losses*

Under former CEO Hilbert's earlier management, Conseco set up a program under which directors and officers borrowed hundreds of millions of dollars from a bank ("the D&O Loans") and used the proceeds to buy Conseco stock, which then continued to fall in value.  Conseco guaranteed to the bank that the loans would be repaid.  During the Class Period, Conseco continued to list as assets the scheduled loan repayments by directors and officers.  According to plaintiffs, the

defendants knew that Conseco did not expect and was not planning to seek repayment by the officers and directors.

The plaintiffs claim that the D&O Loans, which eventually totaled $700 million, were designed to manipulate Conseco's stock price, and that senior employees had been coerced into buying Conseco stock on the open market using loans that far exceeded their means to repay. Plaintiffs claim that Conseco had its directors, executives, and senior officers grant power of attorney to Conseco authorizing loans with the Bank of America National Trust and Savings Association to fund 100 percent of the stock purchases, as well as authorizing purchases of stock which were made at Conseco's sole discretion as to the timing, amount, price, and mechanics. Because Conseco, not the individual participants, was the real party-in-interest, plaintiffs allege, loans were made to individual participants that vastly exceeded their ability to repay. Plaintiffs claim that the defendants, who came in to clean up the mess left behind by Hilbert and his team, knew that the D&O Loans were not going to be collected from the participants, either because they were key insiders from whom Conseco was not going to attempt collection, or because the D&O Loans were simply uncollectible. Defendant Adams, for example, had amassed $19 million in D&O loans, while his salary was "only" $250,000.[14]

_____

[14]After bankruptcy and under a new management team, Conseco's efforts to collect the director and officer loan obligations have resulted in a number of court decisions. See, e.g., *Massey v. Merrill Lynch & Co.*, 464 F.3d 642 (7th Cir. 2006) (affirming dismissal of directors' claims against investment bank for
(continued...)

Plaintiffs claim that defendants recklessly failed to include the D&O Loan guarantee obligations in either Conseco's debt maturities or repayment plans. Plaintiffs claim that throughout the Class Period, defendant Wendt recklessly and repeatedly stated that cash flows and asset sales would be sufficient to repay debt obligations in 2002 and beyond, while knowing that without an extension of the D&O Loan guarantees – an extension that the bank was in fact unwilling to give – Conseco did not have the liquidity to remain viable as a going concern. The plaintiffs allege that the defendants issued materially false and misleading financial statements in each SEC filing during the Class Period because the filings overstated income by failing to include charges to earnings for Conseco's obligations on the D&O Loans. Further, plaintiffs allege that expenses incurred for interest payments on the D&O Loans were improperly capitalized as an asset rather than as an expense.

a.     *Loss Causation and the D&O Loans*

Plaintiffs claim that the misstatements related to the D&O Loans concealed risks that the loans and interest would not be collected and that the loans would make Conseco's debt load unmanageable, threatening the Company's liquidity and imperiling Conseco's ability to restructure other debt.

_____

[14](...continued)
allegedly misrepresenting value of Conseco stock); *Hilbert v. Conseco Services, L.L.C.*, 836 N.E.2d 1001 (Ind. App. 2005) (affirming foreclosure on Hilbert's mansion); *PricewaterhouseCoopers, LLP v. Massey*, 860 N.E.2d 1252 (Ind. App. 2007) (ordering dismissal of two directors' claims against auditors); *Massey v. Conseco, Inc.*, 2004 WL 828229 (S.D. Ind. April 12, 2004).

On March 7, 2002, Solomon Smith Barney analyst Colin Devine issued a report noting that Conseco would need "increased reserves against its Director & Officer employee share program." Plaintiffs argue that the report partially revealed a materialization of the fraud's risk, causing Conseco's shares to drop an additional 4.27 percent. Plaintiffs further allege that the risks of the D&O Loan fraud materialized when Conseco missed bond payments, an event plaintiffs claim Wendt directly tied to Conseco's inability to restructure D&O Loan obligations. This news caused the final plunge in Conseco's shares that resulted in suspension of trading and de-listing by the NYSE.

   b. *Scienter and the D&O Loans*

Plaintiffs allege that the defendants were reckless in their failure to account for D&O Loan losses and in their failure to include the D&O Loans in debt repayment. Plaintiffs argue that their allegations of accounting fraud with respect to the D&O Loans cannot be excused as mere "mismanagement." They allege that the defendants affirmatively overstated income on each Class Period SEC filing by failing to include charges to earnings for Conseco's obligations on the D&O loans and improperly treated interest payments Conseco made on the D&O Loans as an asset rather than as an expense. Plaintiffs further allege that throughout the Class Period, defendants recklessly failed to consider the D&O guarantees in Conseco's debt repayment plans and represented that cash flows and asset sales would be sufficient to repay debt obligations in 2002 and beyond. Plaintiffs claim

that Conseco's guarantees on the approximately $550 million in D&O Loans that would mature in December 2003 gave the defendants a strong motive to inflate Conseco's stock price.  Conseco could have had the cash to pay the D&O Loan guarantees only if Conseco's stock price rose high enough to cover the original cost.

Plaintiffs cite several statements by Wendt that show he understood when he joined Conseco that the D&O Loans were a "severe" half-billion dollar obligation that the company would have to pay in cash.  Despite that understanding, say plaintiffs, during the Class Period Wendt and Conseco recklessly made a series of statements which document that the D&O Loans were recklessly excluded from Conseco's debt repayment plans or liquidity requirements.

4.    *Summary of Application of Pleading Standards*

Plaintiffs' allegations that Conseco's stock price declined as the risks associated with the misstatements and omissions surrounding its manufactured housing business, the B-2 Certificates, and the ill-fated director and officer loans became evident to the market, even before the details of the reasons were disclosed, are sufficient to plead loss causation under *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991 (7th Cir. 2007).

In assessing the element of scienter, the inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 127 S. Ct. at 2509.  In this case, the plaintiffs have alleged in detail repeated and prolonged concealment and deception concerning some of the largest and most critical issues that the new Conseco management team confronted.  The combination of the nature, duration, scope, and financial magnitude of the alleged misstatements and omissions provides a sufficient foundation for the required strong inference of fraudulent intent or scienter.

The court recognizes that other public statements warning investors about challenges the company faced weigh against this conclusion.  But the choice between competing reasonable inferences is not one that the court can make at the pleading stage of this case.  The plaintiffs have satisfied the requirements of

pleading scienter here.  The complaint states with sufficient particularity facts giving rise to a strong inference that the defendant acted with a mental state embracing intent to deceive, manipulate, or defraud that is more than merely plausible or reasonable; it is cogent and at least as compelling as any opposing inference of non-fraudulent intent.  See *id.* at 2504-05.  The most plausible competing inferences are that the defendants were too busy putting out other fires to notice their misinformation or that they were simply incompetent.  These explanations are not sufficiently compelling competing inferences of an innocent mental state so as to require dismissal at the pleading stage.

D.    *Group Pleading Presumption*

The "group-published information presumption" or "group pleading presumption" was first recognized by the Ninth Circuit in *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir. 1987).  In cases of corporate fraud where the false or misleading information is conveyed in corporate publications such as prospectuses, registration statements, annual reports, press releases and other "group-published information," the presumption allows a court to presume that such publications are the result of the collective actions of corporate officers.  See *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 689 (6th Cir. 2005), quoting *Wool*, 818 F.2d at 1440.  Hence, under the presumption, a plaintiff need not identify the individual sources of the misleading

-44-

statements and may instead presume that the statements in a group-published document are attributable to the entire group.

In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602-03 (7th Cir. 2006), the Seventh Circuit addressed the question, for which it noted significant debate among circuit courts, of whether the group pleading presumption survived the heightened pleading requirements of the PSLRA.  The answer was that it did not.[15]  The court adopted the Fifth Circuit's conclusion that "'PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases . . . .'"  *Id.* at 602-03, quoting *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353, 365-66 (5th Cir. 2004).  The court further cited with approval the Eleventh Circuit's similar conclusion that "'that the most plausible reading [of the PSLRA] in light of congressional intent is that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations.'"  *Id.* at 603, quoting *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004).  The Seventh Circuit further stated:  "While we will aggregate the allegations in the complaint to determine whether it creates a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases."  *Id.*

_____

[15]In the Supreme Court's review of *Tellabs*, the Court noted that there was disagreement among the circuits as to whether the group pleading doctrine survived the PSLRA, but did not address the issue and left the Seventh Circuit's determination undisturbed.  *Tellabs, Inc.*, 127 S. Ct. at 2511, n.6.

Plaintiffs in this case have not impermissibly relied upon the group pleading presumption to show that the defendants made the alleged misstatements with scienter.  The second amended complaint alleges that each defendant executed one or more SEC filings during the Class Period that contained the misstatements.  Each individual defendant may be held to have acted with scienter for material misstatements in and omissions from filings he executed.  In the Fifth Circuit case rejecting the group pleading presumption in the context of the PSLRA, cited with approval by the Seventh Circuit, the Fifth Circuit stated:

> corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue.  *Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement.*  Various unattributed statements within documents may be charged to different individuals, and specific facts may tie more than one individual to the same statement.

*Southland Securities Corp.*, 365 F.3d at 365 (emphasis added).  In this case, the plaintiffs have alleged specific facts sufficient to link each individual defendant to misstatements contained in SEC filings he executed personally.

-46-

E.      *Control Person Liability*

The court's analysis of control person liability remains unchanged from its earlier ruling in this case.  See *Schleicher v. Wendt*, 2005 WL 1656871, at *5-6. Plaintiffs allege that the individual defendants are liable for securities fraud under section 20(a) as "controlling persons" of Conseco.  Section 20(a) of the Exchange Act establishes liability as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Defendants  argue that they can be held liable under section 20(a) only "*to the same extent as*" Conseco is held liable.  Since Conseco was discharged in bankruptcy from any potential liability under the Exchange Act, defendants argue, plaintiffs cannot state a claim against them under section 20(a).

Plaintiffs counter by citing *Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971). In *Kemmerer,* the alleged primary violator, an agricultural cooperative association, was dissolved by the defendants.  Defendants there, like the defendants here, argued they could be held liable under section 20(a) only to the same extent as the alleged primary violator; *i.e.*, not at all.  The court disposed of the defendants' argument as follows:

> The premise of this argument is that there is a finding of "no liability" with respect to the [alleged primary violator]. No such finding exists, it appearing instead that the [alleged primary violator] was dismissed from the suit for lack of jurisdiction due to a failure to obtain service of process. It further appears that the reason for the failure to obtain process was that the [alleged primary violator] had been dissolved on the initiative of many of the individual defendants in the present suit. On such facts it is evident that [§ 20(a)] is of no avail to defendants.

*Id.* at 78. While *Kemmerer* involved the alleged primary violator's dissolution rather than its bankruptcy, the Seventh Circuit's reasoning applies here. Accord, *In re CitiSource, Inc. Sec. Litig.*, 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988); *Elliott Graphics, Inc. v. Stein*, 660 F. Supp. 378, 381-82 (N.D. Ill. 1987). Conseco has not been found "not liable" for securities fraud. It would be inconsistent with the broad remedial purposes of the securities laws to permit senior executives of a bankrupt corporation – whose actions allegedly contributed to the bankruptcy – to avoid liability by relying on the same corporation's bankruptcy. The rule that defendants advocate would be the securities law equivalent of the long-abandoned tort rules that once made it better for a tortfeasor to kill a victim than merely to injure him.

Plaintiffs' allegations purporting to establish defendants' control over Conseco are sufficient. The Seventh Circuit views section 20(a) "as remedial, to be construed liberally, and requiring only some indirect means of discipline or influence short of actual direction to hold a control person liable." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992) (internal quotation omitted). The Seventh Circuit looks to whether the alleged control-person

"actually participated in, that is, exercised control over, the operations of the person in general and, then, to whether the alleged control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Id.* at 881. The fact that each defendant signed at least one of the SEC filings alone satisfies this standard. And the complaint as a whole makes clear that each defendant – as CEO (Wendt), COO and CFO (Shea), CAO/Treasurer (Adams), and Executive Vice President/CFO (Chokel) – cannot plausibly deny the kind of control implied by the Seventh Circuit's liberal construction of section 20(a), at least at the pleading stage.

IV.     *Conclusion*

The PSLRA has made it substantially harder for plaintiffs to pursue lawsuits alleging securities fraud. Nevertheless, as the Supreme Court recently noted in *Tellabs*, private securities litigation is an indispensable tool – crucial to the integrity of domestic capital markets – with which defrauded investors can recover their losses. Here, plaintiffs have satisfied the heightened pleading requirements of the PSLRA. Accordingly, defendants' motions to dismiss the second amended complaint (Docket Nos. 159, 173) are hereby denied. The court will hold a status conference in the near future to address the next steps in this action.

So ordered.

Date: September 12, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kwasi Abraham Asiedu
laskido@hotmail.com

Brian Joseph Barry
LAW OFFICES OF BRIAN BARRY
bribarry1@yahoo.com

Peter A. Binkow
GLANCY BINKOW & GOLDBERG LLP
pbinkow@glancylaw.com

Bruce D. Brattain
BRATTAIN & MINNIX
batmi5@aol.com

Claudia Jean Bugh
GLANCY BINKOW & GOLDBERG LLP
cjbjdcpa@aol.com

Brian Eugene Casey
BARNES & THORNBURG
brian.casey@btlaw.com

Hamish S. Cohen
BARNES & THORNBURG LLP
hamish.cohen@btlaw.com

Lionel Zevi Glancy
GLANCY & BINKOW LLP
info@glancylaw.com

Michael Marc Goldberg
GLANCY BINKOW & GOLDBERG
info@glancylaw.com

Michael H. Gottschlich
BARNES & THORNBURG LLP
mgottsch@btlaw.com

Robin Bronzaft Howald
GLANCY BINKOW & GOLDBERG LLP
info@glancylaw.com

Steven Kenneth Huffer
CONSECO SERVICES LLC
steve_huffer@conseco.com

Daniel Edward Laytin
KIRKLAND & ELLIS, LLP
dlaytin@kirkland.com

Jonathan D. Mattingly
BARNES & THORNBURG LLP
jmatting@btlaw.com

Joshua Z. Rabinovitz
KIRKLAND & ELLIS LLP
jrabinovitz@kirkland.com

John W. Reale
KIRKLAND & ELLIS, LLP
jreale@kirkland.com