UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FRANZ SCHLEICHER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:02-cv-1332-DFH-TAB |
| | ) | |
| GARY C. WENDT, WILLIAM J. SHEA, | ) | |
| CHARLES B. CHOKEL, and | ) | |
| JAMES S. ADAMS, | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON CLASS CERTIFICATION

Plaintiffs have filed a class action suit against four senior executives of

Conseco, Inc. based on alleged securities fraud between April 24, 2001 and

August 9, 2002 ("the Class Period").  Plaintiffs' claims against Conseco itself were

resolved as part of Conseco's bankruptcy.   After dismissing plaintiffs' initial

complaint, this court denied a motion to dismiss the plaintiffs' second amended

complaint on September 12, 2007.  529 F. Supp. 2d 959.  Plaintiffs have now

moved to certify a class.  The proposed class is:

> All persons or entities who purchased or acquired Conseco, Inc. securities
> during the period from April 24, 2001, through August 9, 2002, inclusive
> (the "Class Period") and who were damaged thereby.  Excluded from the
> class are defendants, their affiliates and any officers or directors of Conseco,
> Inc., or its affiliates, any members of defendants' immediate families, any
> entity in which any Defendant or a member of their immediate family has
> a controlling interest, and the heirs, successors and assigns of any excluded
> party.

The suit deals with events surrounding the decline and eventual bankruptcy of Conseco during the beginning of this decade. Defendants were brought in as a new management team after disastrous results for Conseco in 1999 and 2000. The facts, as alleged, are detailed in this court's previous opinion. 529 F. Supp. 2d at 962-63. During the class period, the stock fluctuated but eventually crashed to zero value. The company and the defendants shared a great deal of negative information with the market during that period. The thrust of the plaintiffs' fraud case, however, is that even while the defendants were sharing so much negative information with the market, they still deliberately misled investors by misrepresenting or failing to disclose how bad things were in eight critical aspects of the company's finances and operations. The plaintiffs have identified ten specific instances where outside analysts identified and publicized the risks that the defendants had allegedly hidden from the market, so that the stock price dropped significantly in response to the disclosures. These "materializations of the risk" occurred throughout the class period, beginning on November 21, 2001. At that point, the plaintiffs allege, the stock's decline to eventual worthlessness included a realization that the stock price had been previously inflated by the defendants' alleged fraud.

As explained below, the court grants class certification in part. Two of the proposed class representatives meet all the requirements of Rule 23(a). The court will certify a Rule 23(b)(3) class consisting of buyers of common stock during the class period. Other securities buyers must be excluded because plaintiffs have

not provided any evidence that those securities traded in an efficient market that would allow those plaintiffs to rely on the fraud on the market theory to prove reliance.   For a class of common stock buyers, plaintiffs have made a sufficient showing under Rule 23(b)(3) that common issues will predominate and that the case is best managed as a class action.   Plaintiffs have alleged a complicated theory that will be difficult to prove on the merits.   Most of those difficulties, however, are a result of defendants' alleged actions, not those of the proposed class members.   The difficulties would still need to be faced by a single plaintiff who bought stock at different times throughout the class period.

## Discussion

Class certification depends not on which side will prevail but on whether the requirements of Federal Rule of Civil Procedure 23 are met.   See *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).   Plaintiffs seeking to certify a class must show the court that all four requirements of Rule 23(a) and at least one of the sub-parts of Rule 23(b) have been satisfied.   *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008).   The familiar requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy of representation.   Failure to meet any of these requirements will bar class certification.   See *id.*   Plaintiffs seek certification here under Rule 23(b)(3), requiring that "questions of law or fact common to the members of the class predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for the
fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

I.      *Rule 23(a) Requirements*

Rule 23(a)(4) requires that the class representative adequately represent the
interests of the class.  Defendants argue that each of the three common stock
buyers among the proposed class representatives cannot meet the requirement.
They argue that plaintiff Lanese relied on private conversations with Conseco's
Investor Relations Department, giving rise to individual defenses.  Plaintiff Smith
has been convicted of fraud.  Plaintiff Schleicher made his final purchase of
Conseco stock on December 27, 2001, before some of the alleged wrongdoing
undertaken by Conseco, and defendants argue that he does not have standing to
represent the class for the rest of the events at issue.

*Lanese*:  If a plaintiff relied on material, non-public information when
making investment decision, he could not use the fraud on the market
presumption (discussed at length below), so that his claims would not be typical
and he would not be an adequate representative.  *E.g.*, *In re DVI Inc. Securities
Litigation*, 249 F.R.D. 196, 202 (E.D. Pa. 2008).  After plaintiff Lanese read an
analyst report skeptical of Conseco's future performance, he called the company's
head of investor relations and talked to the person twice.  The investor relations
contact described the report with an expletive.  Lanese was questioned about the

-4-

conversations in his deposition.  He remains an adequate class representative because all of the information given by investor relations was public information. See *In re DVI Inc. Securities Litigation*, 249 F.R.D. at 202 (allowing lead plaintiffs to continue where all the information conveyed was "either immaterial or publicly available"); *In re Independent Energy Holdings PLC Securities Litigation*, 210 F.R.D. 476, 482 (S.D.N.Y. 2002) ("courts have consistently certified classes where there was no evidence that the named plaintiffs received non-public information from a corporate officer").  Here, defendants have made no showing that the information conveyed to Lanese was not publicly available.  Defendants argue that the emphatic tone of the investor relations' representative represents non-public information.  The court is not persuaded that the fact that a company representative said he or she actually believed its public statements amounted to new information not shared by the class as a whole.

Defendants argue that they need show only that Lanese is "subject to the colorable defense of non-reliance on the market." *Zandman v. Joseph*, 102 F.R.D. 924, 931 (N.D. Ind. 1984).  "Colorable" still requires more than mere speculation. The proposed class representative in *Zandman* "did not rely on the statements of third parties who merely reiterated, digested or reflected the purported misrepresentations of the defendants," but instead admitted reliance on conversations with outside entities, including with a potential customer of the company at issue.  *Id.*  The emphatic way in which an investors relations representative affirmed publicly available information in this case does not give

rise to a genuinely "colorable" defense that makes Lanese an inappropriate class representative.

*Smith*:  Defendants have raised a genuine problem with plaintiff Smith as a class representative.  Mr. Smith was convicted of criminal insurance fraud based on a claim he filed after a fire at his house.  The conviction was more than ten years ago and has been expunged from his record by the state courts. Nevertheless, a criminal fraud conviction is extremely troubling for someone who seeks to serve as a fiduciary for absent class members asserting they are the victims of a fraudulent scheme.  The cases plaintiffs cite do not support the remarkable suggestion that a person convicted of criminal fraud would be a suitable class representative, especially in a fraud case.  Plaintiffs rely, for instance, on *Levie v. Sears, Roebuck & Co.*, 496 F. Supp. 2d 944, 950 (N.D. Ill. 2007), for the proposition:  "To satisfy the adequacy of representation prong of Rule 23(a)(4), the interests of the class representative must coincide with those of the rest of the class."  That passage did not amount to an endorsement of convicted felons as class representatives in securities fraud cases.  In *Levie*, one of the named plaintiffs had been sanctioned by the National Association of Securities Dealers for deceptive stock transactions.  The court concluded that the fact "bears upon his credibility only, but not on his qualifications to represent the class."  *Id*.  In neither *Levie*, nor the other cases cited by plaintiffs, though, had the proposed class representative been convicted of criminal fraud.

The issue does not seem to arise too often (and understandably so).  Still, several courts have held that a fraud conviction undermines a proposed class representative's adequacy to represent the class.  *Xianglin Shi v. Sina Corp.*, 2005 WL 1561438 (S.D.N.Y. July 1, 2005) (disqualifying proposed group as class representative whose member with the largest financial interest had been convicted of providing false information to a financial institution); *Hartsell v. Source Media*, 2003 WL 21245989, at *3 (N.D. Tex. March 31, 2003)("recognition of that fiduciary duty to the class as a whole should compel recognition of a serious potential problem for the class, when a class representative, whose duties obviously require acting on behalf of absent persons, is convicted of a felony involving fraud"); *In re Proxima Corp. Securities Litigation*, 1994 WL 374306 (S.D. Cal. May 3, 1994) (disqualifying class representative who admitted to fraud).  This court is not willing to appoint as a class representative a person with a criminal conviction for fraud.   Plaintiffs point out that Smith's conviction was later expunged from his record.  That fact offers little comfort, at least without much more detail about the reasons for it.  There is no indication here that it was a matter of actual innocence.  This court will not force class members to rely on a representative who has admitted to fraud.   Smith is not an adequate class representative.

*Schleicher*:  The argument against Schleicher is that he has no standing to pursue the claims based on allegedly fraudulent statements made after his last stock purchase on December 27, 2001.   Defendants contend that he cannot

represent a class that includes those who purchased after he did.  On this point, defendants' reliance on *Davis v. SPSS, INC.*, 385 F. Supp. 2d 697 (N.D. Ill. 2006), is misplaced.  The plaintiff in *Davis* was a single plaintiff attempting to pursue a class action.  Here, Schleicher is teamed up with Lanese, who purchased common stock on the last day of the proposed class period.

In any event, defendants' argument has been rejected in many similar cases. See, *e.g.*, *Danis v. USN Communications, Inc.*, 189 F.R.D. 391, 398-99 (N.D. Ill. 1999) (allowing one class representative who purchased in the initial public offering and one who purchased in the aftermarket and noting that defendant's "argument has been repeatedly rejected in fraud-on-the-market cases").  "[W]ere the rule otherwise, there could never be a class action in securities fraud cases because a representative plaintiff would potentially be needed for each day of the class period, since on each day the mix of information available to the public would vary."  *Feldman v. Motorola, Inc.*, 1993 WL 497228, at *6 (N.D. Ill. Oct. 14, 1993) (considering issue as part of challenge to typicality).  The combination of Schleicher and Lanese certainly suffices to represent the interests of potential class members.  Their claims are typical.  "Typical, does not mean identical, but requires only a similarity between the essential characteristics of the claims advanced by the lead plaintiffs and those on behalf of the class."  *Id.* at 399 (internal citations omitted); accord, *Makkor Issues &Rights, Ltd. v. Tellabs, Inc.*, 2009 WL 448895, at *12 (N.D. Ill. Feb. 23, 2009) (allowing "in-and-out" trader who

sold stock before the defendant's first corrective statement to serve as class representative).

II.     *Rule 23(b) Requirements*

Plaintiffs seek to certify a class under Rule 23(b)(3), which requires them to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Defendants argue that individual issues will dominate common issues for several elements of plaintiffs' claims.  These challenges require the court to look ahead to the merits of the case, though not to try to decide those merits.

To state a claim for securities fraud under Rule 10b-5 under the Securities Exchange Act of 1934, plaintiffs must prove:   (1) that a defendant made a misstatement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of a security (5) on which the plaintiff relied and (6) which caused the plaintiff's damages.  See *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997).  Plaintiffs argue that common questions dominate all of these determinations.

A.     *Reliance and Fraud on the Market*

To satisfy the prong of reliance, plaintiffs invoke the fraud on the market theory approved by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  In general, the theory allows the court to presume that investors in a market variously described as "impersonal," "open," "developed," and "efficient" relied on the integrity of the market price that reflected available public information, including statements the issuer and its agents had made to the market.  See *id.* at 244-45, 248 & n.27.  To determine whether a market is efficient enough to apply the fraud on the market theory, many courts have applied the so-called *Cammer* factors:  (1) whether the stock trades at a high weekly volume; (2) whether securities analysts report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form S-3, as opposed to Form S-1 or S-2; and (5) whether there are empirical facts showing a causal relationship between unexpected corporate events or public releases and a subsequent response in the stock price.  See *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).

The *Cammer* factors have not yet been adopted by the Seventh Circuit, but they are considered in other circuits.  See, *e.g.*, *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198-99 (6th Cir. 1990); accord, *In re Xcelera.com Securities Litigation*, 430 F.3d 503, 511 (1st Cir. 2005) (considering the factors but finding them "not exhaustive"); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (same).  These factors have also been used by another district court in the Seventh Circuit.  *Tatz v. Nanophase Technologies Corp.*, 2003 WL 21372471, at *7 (N.D. Ill.

June 13, 2003).  Defendants do not contest the applicability of the *Cammer* factors and do not assert any other relevant consideration outside the *Cammer* factors.

The dispute here is over the fifth factor, "whether there are empirical facts showing a causal relationship between unexpected corporate events or public releases and a subsequent response in the stock price."  To support their fraud on the market theory, plaintiffs have submitted a report from Professor Steven P. Feinstein, Ph.D., an Associate Professor of Finance at Babson College, a Massachusetts college that specializes in business.  Defendants challenge a series of assumptions made by Dr. Feinstein in his report, arguing that they undermine plaintiffs' attempts to use the fraud on the market theory of reliance.  Without the fraud on the market theory, defendants contend, individual issues of reliance will predominate over common issues.

Dr. Feinstein's report is based on an event study of a series of eleven public events during the class period, such as earnings reports, rating agency downgrades, and other news-making events specific to Conseco.  Dr. Feinstein then took the resulting changes in stock price and ran a regression analysis to isolate the changes in Conseco price as compared to the market as a whole, through the S&P 500 and a peer group index, the S&P Financial Index.  He concluded that following nine of these eleven events, the stock price moved in a statistically significant direction and degree.  In addition, Dr. Feinstein ran a regression for each day in the year before the class period.  According to those

findings, Conseco traded independently of the market based on its own value. According to Dr. Feinstein, the fact that Conseco's share price was so attuned to these events specific to the company shows that it was being traded in an efficient market.  Defendants do not question Dr. Feinstein's math, but they question his inputs and his conclusion.

1.     *Debt Securities and Preferred Stock*

Defendants first argue that even if Dr. Feinstein's report is reliable for common stock, the omission of information about debt securities and preferred stock means those securities cannot be a part of the class.  Dr. Feinstein did not include those types of securities in his study.  Feinstein Dep. 152.  According to defendants, the common stock evidence is not sufficient to include these other securities because "a comparison between equity and bond markets is a comparison between the proverbial apple and orange." *In re Enron Corp. Securities Litigation*, 529 F. Supp. 2d 644, 755 (S.D. Tex. 2006) (finding bonds traded in an efficient market only after considering separate proof of efficiency in the bond market).

Plaintiffs respond that no evidentiary showing is required in the Seventh Circuit.  The question becomes, however, how this court is supposed to know whether the preferred stock or other debt securities traded in an efficient market, which is essential for a class relying on fraud on the market.  Plaintiffs cite three

cases where investors in securities other than common stock were not forced to provide special proof of market efficiency. All three cases are easily distinguishable from the current case. In *In re WorldCom, Inc. Securities Litigation*, 219 F.R.D. 267, 294 (S.D.N.Y. 2003), the court noted: "There is no dispute that the market for WorldCom securities was an open and developed market, including the market for WorldCom bonds." Here, defendants have not agreed on this point. This court allowed a presumption of reliance for notes in *Central Community Church of God v. Ent & Imler CPA Group*, 2005 WL 1115960 (S.D. Ind. May 9, 2005). That case has little bearing on a dispute over Conseco securities because there the notes were not traded in an open and efficient secondary market, and the plaintiffs were not attempting to proceed on a fraud on the market theory. The plaintiffs instead were the original buyers of the bonds who were entitled to rely on the integrity of the original issuing prospectuses for the bonds. *Id.* at *6. Plaintiffs' final case, *Bruhl v. Price Waterhousecoopers Intern.*, 2008 WL 4500328 (S.D. Fla. Sept. 30, 2008), allowed for class-wide proof of reliance based on *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the case was based primarily on acts of omission.

The plaintiffs have not provided any information on the market for securities besides common stock. They have not shown the number of potential plaintiffs, trading volume for these securities, the buy and sell spreads, or any other relevant considerations. The only knowledge this court has was provided by defendants, who provided charts with the price movements of five different classes of preferred

shares and thirteen different note issues.  The prices of these securities moved in a similar fashion over time (namely down), but they did not closely track the more volatile stock price.

Plaintiffs are asking this court to hold, in effect, that evidence of an efficient market for common stock allows a court to infer that the markets for all other publicly traded securities from the same issuer are also efficient.  Absent any evidence, this court cannot make that inference.  Without a baseline presumption of reliance, individual issues will predominate in determining reliance for plaintiffs who purchased securities other than common stock.  See *Basic*, 485 U.S. at 224 ("Requiring proof of individualized reliance from each member of the proposed plaintiff class would effectively have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones.").

2.    *Common Stock*

Conseco common stock traded on the New York Stock Exchange throughout the class period.  During that time, daily trading volumes averaged more than four million shares.   Feinstein Report ¶ 25.   The company's average market capitalization throughout the class period was $2.3 billion.  Feinstein Report ¶ 66. This amount of capitalization placed Conseco in the top 40 percent of all publicly traded companies.  Feinstein Report ¶ 68.  During the class period, Conseco common stock was even part of the S&P 500 index.  Beyond these factors, Dr. Feinstein used an event study to show that Conseco traded in an efficient market. Yet defendants contend the market for Conseco common stock was not so efficient as to allow use of the fraud on the market theory.

Defendants attack Dr. Feinstein's report on two primary grounds.  First they argue against his "results-oriented" methodology based on the days that he chose for his event study.  Second, they argue that Dr. Feinstein failed to consider loss causation, linking the decline in stock price to the fraud alleged.  Defendants do not provide their own expert, or any evidence at all, to rebut Dr. Feinstein's finding of an efficient market.   Instead, they have merely tried to poke holes in Dr. Feinstein's methodology.

In so doing, defendants have misunderstood what is required to show a fraud on the market theory of reliance.  Dr. Feinstein's report is necessary to show

only that Conseco shares were trading in an efficient market.  Their mere presence

on the New York Stock Exchange certainly tends to show an efficient market, but

Dr. Feinstein's study shows sufficiently that the common stock traded in an

efficient market.  Dr. Feinstein's methodology was crucially different from the

methodology of the expert admonished by Judge Young of the District Court of

Massachusetts in *In re PolyMedica Corp. Securities Litigation*, 453 F. Supp. 2d. 260,

269-70 (D. Mass 2006).  Plaintiffs' expert in that case chose the five days with the

biggest price movement and then found that news events preceded the price

movement.  Judge Young noted that the "mere listing of five days on which news

was released and which exhibited large price fluctuations proves nothing."  *Id.* at

270.  Defendant PolyMedica had provided its own expert to refute some of the

plaintiffs' expert's findings in that case.  PolyMedica's expert criticized the

plaintiffs' expert because he "'went and searched for the largest price drops.

That's not a scientific study.  A scientific study is one where you draw a sample

and then you compare a test statistic from that sample to another sample.'"  *Id.* at

269.


Dr. Feinstein's report does not match all the standards set forth by

PolyMedica's expert, but he used a more rigorous approach than the plaintiffs'

expert in that case.  Rather than cherry-pick days with the biggest changes in

price, Dr. Feinstein collected a sample of days that he deemed contained

important news.  The price movement on those days was then shown to be

statistically significant on nine of those eleven days, tending to show an efficient

market.   Also, as part of this event study, Dr. Feinstein studied the price movement on a daily basis for the year before the class period, and the "results show that the Company's stock price generally moved independently from the market and peer group."  Feinstein Report ¶ 93.  Those observations also tended to support the finding of an efficient market for the stock.

Defendants also make the contradictory argument that Dr. Feinstein's study is insufficient because he did not include all ten events at issue in this suit.  They cannot accuse Dr. Feinstein of cherry-picking and then argue that he did not do sufficient cherry-picking.  The purpose of the efficient market analysis is not to show whether each alleged statement in the complaint led to a significant price movement.  The purpose is to demonstrate more generally that the stock was trading in an efficient market, which supports the inference that plaintiff-investors relied on the market price.  See *Basic*, 485 U.S. at 247 ("Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.").

Dr. Feinstein has presented a comprehensive event study whose mathematical outputs defendants do not contest.   He has the specialized education and experience to provide admissible expert opinions.  Defendants have offered no expert and no evidence to show that his calculations or conclusions are incorrect.  They go so far as to argue, without *any* support, that Dr. Feinstein's

findings of nine statistically significant movements in eleven days do not support the conclusion that Conseco was traded in an efficient market.

Dr. Feinstein's study adequately shows that Conseco common stock was traded in an efficient market during the period in question.  Since Conseco does not question the other *Cammer* factors as presented by Dr. Feinstein, plaintiffs have made an adequate showing to proceed under a fraud on the market approach to reliance.

Defendants rightly point out that the presumption of fraud on the market is rebuttable.  *Basic*, 485 US at 248 ("Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.").  Here, however, defendants have not made a reasonable showing that a large number of individual class members did not rely on the market price.  The fraud on the market theory is available in this case alleging fraud regarding a common stock traded on the New York Stock Exchange and included in the S&P 500 index.

3.     *Short Sellers and Others*

Defendants argue next that short sellers cannot rely on the fraud on the market presumption because, by their very nature, short sales are based on the belief that the market price does not accurately value the stock.  Defendants say that unlike most cases where short sellers may be few in numbers, the unique situation of Conseco during the proposed class period led to a serious increase in short sales of Conseco stock.  A Bloomberg report shows that short interest in the stock ranged from 11.47% on April 12, 2001 to 28.16% on July 15, 2002.  Def. Br., Ex. K.  Defendants argue that short sellers must prove reliance individually and that the large percentage of short sellers undermines the efficacy of a class action because the individual issues will dominate the question of reliance.

On this point, defendants rely primarily on a Third Circuit opinion that predates *Basic*, *Zlotnick v. TIE Communications*, 836 F.2d 818 (3d Cir. 1988).  There, an individual plaintiff who was a short seller was not afforded the benefit of a fraud on the market theory.  A short seller, the Third Circuit wrote, does not believe that the market price is actually the real value of the stock:

> The traditional purchaser depends on the "market" to determine a present value for the stock that allows the purchaser an adequate return on his investment.  On the other hand, the short seller depends for a return on his investment on the "market" realizing that the value of the stock at the time of the short sale does not allow for an adequate return on the investment.  This realization is what drives the price of the stock down and allows the short seller his profit.

*Id.* at 823.  As a result, goes the theory, the short seller is not relying on the accuracy of the market but believes that the market is incorrect.  The plaintiff was therefore forced to show individual reliance.  Accord, *Ganesh L.L.C. v. Computer Learning Centers, Inc.*, 183 F.R.D. 487, 491 (E.D. Va. 1998).

*Zlotnick* is not binding on this court, and defendants' reading of the case is not persuasive in the class certification setting.  The Seventh Circuit has acknowledged that short sellers can recover under Rule 10b-5, though without addressing whether short sellers can invoke the fraud on the market theory.  See *Fry v. UAL Corp.*, 84 F.3d 936, 938-39 (7th Cir. 1996).  More recent decisions within the Third Circuit have disagreed with the rationale of *Zlotnick*.  In *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666 (E.D. Pa. 2004), the court limited *Zlotnick* to its facts:  "In short, *Zlotnick* held only that a plaintiff who sells short because he believes that a stock is overvalued is not entitled to the fraud on the market presumption."  *Id.* at 676 (allowing short sellers who sold Rite Aid stock as a hedge against declines in convertible bond prices to invoke fraud on the market); *Moskowitz v. Lopp*, 128 F.R.D. 624, 631 (E.D. Pa. 1989) ("The fact that these traders have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof that price played *no* part whatsoever in their decision making.") (emphasis in original).

Short sellers seem like a difficult case at first because, unlike the majority of investors buying a stock, they expected the price of the stock to go down after they made the short sale.  Their decisions about the value of the stock, however, can still be based on the integrity of the market price.  Their disagreement with traditional buyers is that the current market price is too high, not too low.  Even when a stock declines overall, the short seller can be injured if she has to cover her position earlier than she wants, a decision that would be based on the allegedly inflated market price.  To the extent that a short seller was injured, that person should still be able to rely on the fraud on the market presumption.  *Basic* makes no exception for short sellers:  "An *investor* who buys or sells stock at the price *set by the market* does so in reliance on the integrity of that price."  *Basic*, 485 U.S. at 247 (emphasis added).  Short sellers are investors who simply think the current price "set by the market" is too high.  To the extent that short sellers were vindicated and did not suffer losses, however, they will not be entitled to recover damages.

In *WorldCom*, defendants made similar arguments that several groups of investors, including short sellers, would require individualized proof of reliance.  The court rejected that reading of *Basic*:  "Each of the investment strategies identified by the SSB Defendants depended directly on the publicly available information concerning WorldCom, as reflected in the price of WorldCom's securities."  *WorldCom*, 219 F.R.D. at 301.  The short sellers were trading in the same efficient market where every other investor was trading.  Those who lost

money relied on the market providing an honest price.  In fact, if they had not believed the market, they likely could have allowed the stock to drop further before they covered and then would have profited.  Some of those who lost money were in fact particularly damaged by the allegedly fraudulent statements.  Short sellers turned out to be correct about the proper value of Conseco stock, but the allegedly fraudulent statements could have left the stock price higher than it should have been when they bought to cover their short sales.[1]

The court rejects the defendants's argument that individual rebuttal evidence will dominate because individual plaintiffs were "speculators."  Simply because the investments were high risk did not mean that the investors did not depend on the integrity of the market or the available information.  Proving reliance based on the fraud on the market theory does not require that each investor thinks the fair market price will forever be the exact worth of the company.  Most investors – even "speculators" – buy stocks because they think their value will increase.  The fact that these investors were taking a larger risk (with the chance of a larger reward) does not mean that they did not rely on the market to set an effective price for Conseco stock.  Defendants cite no case law

---

[1]The fact that short sellers were correct highlights the incongruity of excluding them from a class action.  Typical investors who bought Conseco stock obviously expected that the price would go up, not that it was at some sort of perfect value.  The fraud on the market presumption is based on the assumption that all available information is reflected in the price of the stock.  It does not follow that each individual investor thinks the stock is appropriately priced.  Presumably most buyers think it will go up, but just because an investor thinks it will go down does not mean she is not basing her assumptions on the market price.

that describes speculative investments as warranting individual rebuttal.  To the extent that plaintiffs purchased Conseco stock in the hopes that the price would increase, individual rebuttal of reliance is not appropriate.

Accordingly, plaintiffs have shown sufficiently that for a class of buyers of common stock, common issues will predominate over individual issues with respect to the reliance element of the securities fraud claims.

B.    *Other Elements – Predominance of Common or Individual Issues*

Defendants argue that individual issues will dominate with respect to other elements of the securities fraud claims.  In addition to the reliance element, defendants also argue that proof of loss causation, proof of misrepresentation or omission (falsity), proof of materiality, proof of scienter, and proof of the amount of damages will all be dominated by individual issues.  Some of these issues will be addressed in more detail, but the general theory of the case and securities class action law dispose of some of defendants' arguments.  The arguments on misrepresentation, materiality, and scienter all fail because the inquiries focus on the defendants' own actions.  Proof would be essentially the same whether there is one plaintiff or five thousand.  The prospect of handling issues of loss causation and damages in a class action requires more attention.

Defendants argue that the changing roles of the individual defendants and the fact that the supposedly misleading information manifested itself in stages requires individual proof.  At trial, each individual defendant's liability will have to be determined as to each event.  For instance, it is possible that someone could have purchased stock on May 1, 2001 and relied on statements that could not have been made by defendant Shea, who was not even employed by Conseco at that time.

Defendants make much of this possible series of events to highlight possible differences among class members.  Many of these arguments involve different determinations of what an individual defendant did.  For instance, defendants argue that individual issues predominate on scienter because the proof of that issue will not be common to all class members.  These defendant-focused arguments are misplaced.  While each class member may not have a relevant claim against each defendant, the overall issue of each defendant's scienter will be easier to resolve in a class action than in many individual trials involving the same evidence.  Defendants overstate the requirement of predominance of class issues.  It is not essential that every issue at trial be relevant to every plaintiff.  Efficiency is still served if most of the issues are common.  It will be more efficient to determine scienter and whether the ten statements at issue were false in one trial than in a series of hundreds of individual actions.

The predominance of common issues is equally true of materiality because materiality is judged not on the basis of impact on an individual class member but on an objective standard.  "The question for all plaintiffs, then, is whether the hypothetical reasonable investor would attach importance to a particular misstatement.  This is an objective standard.  Therefore, the essential inquiry into materiality is the same for all claims."  *Harman v. LyphoMed, Inc.*, 122 F.R.D. 522, 526 (N.D. Ill. 1988).  Statements throughout the class period will be deemed material or immaterial by a jury based on each defendant's conduct, not based on each statement's impact on each plaintiff.  Those decisions by the jury will affect which class members can recover.

### 1.    *Loss Causation*

Defendants make two arguments for why the class should not be certified based on loss causation.  First, they contend that even at the class certification stage, plaintiffs must prove loss causation to benefit from the fraud on the market presumption. The argument relies on the Fifth Circuit decision in *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007).  Second, defendants argue that the loss causation determination will be dominated by individual issues.

In *Oscar Private Equity*, the plaintiffs were purchasers of the common stock of Allegiance Telecom.   The plaintiffs alleged the defendants made material

misrepresentations throughout the first three quarters of 2001, which were corrected in the fourth quarter of 2001.  The stock was falling rapidly even before the corrective disclosure as part of a market-wide decline in the value of telecom stocks.  The stock had fallen from nearly $15 a share at the start of the class period to $3.70 a share when the curative statement was made.  The Fifth Circuit rejected certifying that class because "we require plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption."  *Id.* at 265.  The holding was not so broad as to make proof of loss causation a part of *any* securities fraud class certification proceeding, which would be difficult to reconcile with Eisen by seeming to require a plaintiff prove a portion of the case at the class certification stage.  Instead, this requirement appears to be limited to situations where the stock is in steep decline, as in this case.  In response to a dissent that read the majority's opinion expansively, the *Oscar Private Equity* majority noted that they addressed "only the simultaneous disclosure of multiple negatives, not all of which are alleged culpable."  *Id.* at 265, n.22.


Even under this more limited reading of *Oscar Private Equity*, which could apply here, this court does not find it persuasive in requiring proof of loss causation *at the class certification stage*.  Defendants cite no court outside the Fifth Circuit that has relied on this reasoning.  In fact, this aspect of *Oscar Private Equity* has been rejected by numerous courts.  See, *e.g.*, *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 185-86 (S.D.N.Y. 2008) (declining to follow *Oscar Private Equity* and collecting cases in the Second Circuit rejecting the holding).  *Oscar*

*Private Equity* runs contrary to Supreme Court and Seventh Circuit precedents
that are controlling for this court.  "We find nothing in either the language or
history of Rule 23 that gives a court any authority to conduct a preliminary
inquiry into the merits of a suit in order to determine whether it may be
maintained as a class action."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177
(1974).  The focus of the court's inquiry should be on whether the requirements
of Rule 23 are met.  Thus, in *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676
(7th Cir. 2001), district courts were instructed to "make whatever factual and legal
inquiries are necessary under Rule 23."

The *Oscar Private Equity* court argued that proof of loss causation is part of
the Rule 23 analysis because in cases where the stock is already declining, the
presumption in favor of the fraud on the market theory is rebutted.  This court
reads *Basic* to require a different result.  The key  determination is whether the
stock was trading in an efficient market.  If so, then the issue under Rule 23(b)(3)
is whether loss causation can be proven on a class-wide basis.  See *Basic*,
485 U.S. at 249, n. 29 (declining to perform a "factual analysis" at this point of
issues raised by the dissent, including investors who purchased after the first
false statement and investors who did not believe the false statement).  The *Oscar
Private Equity* court's problem with loss causation was a class-wide problem, and
it is not the court's job to ascertain the merit of that element of the claim at the
class certification stage.  The plaintiffs here have shown that Conseco common

stock traded in an efficient market, and as shown below, individual issues of loss causation do not predominate in the case as a whole.

Defendants argue in detail that loss causation will be dominated by individual issues.  Under plaintiffs' theory, several different actors acting at different times are alleged to have made inaccurate pubic disclosures.  It is possible that some of the statements at issue satisfied the statutory standard while others did not.  Also, some buyers who also sold, such as short sellers who did not lose money or investors who sold their stock before the stock price deflated, did not actually suffer damages.  Defendants argue, therefore, that an individualized inquiry will have to be undertaken to show loss causation.

This argument, while more detailed than defendants' arguments on materiality and scienter, is also not persuasive.  While proof of loss causation may be difficult here, the more efficient means of trying the issue is through a class action.  If a jury determines that wrongful actions undertaken by defendants led to damages, the appropriate plaintiffs who bought and sold at the relevant times and thus lost money will be able to recover.  Judge Barbadoro faced a similar issue in deciding whether to certify a plaintiff class in *In re Tyco International, Ltd.*, 236 F.R.D. 62 (D.N.H. 2006), where the defense argued that loss causation would cause insuperable problems of class-wide proof because of differences as to when class member sold their stock during a period with three corrective disclosures. The court rejected the argument, noting that classes are routinely certified in

securities fraud cases even where there are individual issues with respect to some parts of the case, such as affirmative defenses or damages. *Id.* at 71.  The court applied that principle to the issue of loss causation:  "Here, the need to make different loss causation determinations for class members depending on when they sold their stock does not alter the 'sufficient constellation of common issues [that] bind class members together' in a single class."  *Id.*, quoting *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000).

Similarly in this case, the calculation for loss causation will be difficult because of the intervening negative disclosures that Conseco did make.  A number of factors will be at work for the jury to unravel.  If plaintiffs can show that the alleged misstatements by Conseco were fraudulent and that, once discovered, made the stock drop and damaged plaintiffs, then they can recover.

Defendants seem to have conflated the individualized damage showing and the need to prove loss causation.  "The plaintiffs will have the burden of showing that the misrepresentations and omissions that they have identified caused the loss of which they complain. If they carry this burden, loss causation will be established."  *WorldCom*, 219 F.R.D. at 302.

At the class certification stage, plaintiffs do not need to prove their damages. They have alleged a number of steps taken by defendants that state a claim for recovery under Rule 10b-5.  To determine if any plaintiff was actually damaged,

the fact finder will have to reach a conclusion about what actions, if any, by defendants violated Rule 10b-5.  Those determinations, together with evidence on the effects of "leakage" of negative information and/or corrective disclosures to the market will translate into determinations of loss causation, which may be different for those who bought and sold their stock at different times.  This determination of loss causation will not be truly "individualized," though it may be necessary to differentiate among groups of class members who bought and sold at different times.  Plaintiffs who bought and sold in between particular relevant disclosures will be treated similarly.  Compiling a list of which class members bought securities at which times and whether they suffered damages should not be too difficult once a determination has been made on which conduct by defendants, if any, was unlawful.[2]

---

[2]At this point, a single class appears to be appropriate, but if the proof of loss causation problem becomes too complex, subclasses may be necessary based on times when stock was purchased and sold.  The prospect that market corrections occurred as information "leaked" into the market could make the loss causation especially complicated, see *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005), but it will be no more complicated in one class action trial than in many individual trials.

2.    *Individualized Damage Determinations*

The common issues of fact and law will predominate at trial.  The main focus of the trial will be whether the defendants fraudulently kept the stock price artificially high.  The calculation of how much a given plaintiff is injured is a separate, and also complex problem.  At some stage, individual determinations will need to be made based on when the class members bought and sold stock and at what prices.  The need for such individual damage determinations does not necessarily defeat class certification under Rule 23(b)(3).  See, *e.g.*, *Carnegie v. Household International, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  Those determinations will be based on findings that the jury will make in the principal trial on the merits, though, so the need for individual damage determinations should not defeat class certification here.

To show that damages will be dominated by individual issues, defendants cite an unpublished opinion that dealt with a class action against a used-car salesman.  In that case, damages were based in part on "the stress, concern, and anxiety associated with the disputed transaction and subsequent events; alleged damages associated with undisclosed mechanical difficulties concerning the car that manifested in subsequent months; and alleged problems concerning subsequent credit reporting and collection efforts."  *Hamilton v. O'Connor Chevrolet, Inc.*, 2006 WL 1697171, at *9 (N.D. Ill. June 12, 2006).  Defendants also rely on an antitrust case for the proposition that class actions "may not be

suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation." *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) (denying class certification in a monopolization case based on individualized damages inquiry).

In this case, the jury must determine the impact of defendants' actions on the price of common stock. The actual calculations of damages may be more complex than simple arithmetic from that point, but numerous possible models can be devised. See, *e.g.*, *In re Broadcom Corp. Securities Litigation*, 2005 WL 14303756 (C.D. Cal. June 3, 2005) (considering multiple possible means of calculating damages in securities litigation and noting that "Rule 23 allows district courts to devise imaginative solutions to problems created by the presence of individual damages issues in a class action litigation"); *Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (original source of quotation). At this point, the court will not endorse any particular means of establishing damages.

The court is doubtful, however, about plaintiffs' suggestion that the jury in the class trial should determine a total sum for class damages. Following such a determination with individual damage determinations for each class member would, at the very least, raise some tricky issues under the Seventh Amendment. A second jury may not re-examine the same issues already decided by the initial jury. *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995). This

potential problem, however, does not mean that individual damage determinations make a class action not manageable.  Instead, this court will need to "carve at the joint."  *Id.* at 1302.  Here, an initial jury could determine all the elements of the plaintiffs' claims except actual damages.  Damages are an element of the cause of action and will require an individualized showing on some level.  Nonetheless, this eventual calculation does not undermine the overall benefits of class certification for the larger liability phase.

## Conclusion

For the foregoing reason, plaintiffs' motion to certify a class is granted for a plaintiff class of all persons or entities who purchased or acquired Conseco, Inc. common stock during the period from April 24, 2001, through August 9, 2002, inclusive.  Excluded from the class are defendants, their affiliates, and any officers or directors of Conseco, Inc., or its affiliates, any members of defendants' immediate families, any entity in which any defendant or a member of his immediate family has a controlling interest, and the heirs, successors and assigns of any excluded party.  With that modified class definition, the proposed class is approved with plaintiffs Schleicher and Lanese as the class representatives, and lead counsel as counsel for the plaintiff class.

So ordered.

Date: March 20, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kwasi Abraham Asiedu
laskido@hotmail.com

Brian Joseph Barry
LAW OFFICES OF BRIAN BARRY
bribarry1@yahoo.com

Peter A. Binkow
GLANCY BINKOW & GOLDBERG LLP
pbinkow@glancylaw.com

Bruce D. Brattain
BRATTAIN & MINNIX
batmi5@aol.com

Barrie Laine Brejcha
BAKER & McKENZIE LLP
barrie.l.brejcha@bakernet.com

Claudia Jean Bugh
GLANCY BINKOW & GOLDBERG LLP
cjbjdcpa@aol.com

Brian Eugene Casey
BARNES THORNBURG
brian.casey@btlaw.com

Hamish S. Cohen
BARNES & THORNBURG LLP
hamish.cohen@btlaw.com

Katherine C. Den Bleyker
GLANCY BINKOW & GOLDBERG LLP
kdenbleyker@glancylaw.com

Thomas Anthony Doyle
BAKER & MCKENZIE LLP
thomas.a.doyle@bakernet.com

Lionel Zevi Glancy
GLANCY & BINKOW LLP
info@glancylaw.com

Michael Marc Goldberg
GLANCY BINKOW & GOLDBERG
info@glancylaw.com

Michael H. Gottschlich
BARNES & THORNBURG LLP
mgottsch@btlaw.com

Robin Bronzaft Howald
GLANCY BINKOW & GOLDBERG LLP
info@glancylaw.com

Steven Kenneth Huffer
CONSECO SERVICES LLC
steve_huffer@conseco.com

Robert J. Kopecky
KIRKLAND & ELLIS
rkopecky@kirkland.com

Daniel Edward Laytin
KIRKLAND & ELLIS, LLP
dlaytin@kirkland.com

Jill  Levine
GLANCY BINKOW & GOLDBERG LLP
jilllevine1@yahoo.com

Jonathan D. Mattingly
BARNES & THORNBURG LLP
jmatting@btlaw.com

James T. McLaughlin Jr.
KIRKLAND & ELLIS, LLP
jmclaughlin@kirkland.com

Joshua Z. Rabinovitz

KIRKLAND & ELLIS LLP
jrabinovitz@kirkland.com

John W. Reale
KIRKLAND & ELLIS, LLP
jreale@kirkland.com

Todd G. Vare
BARNES & THORNBURG LLP
todd.vare@btlaw.com

Avraham N. Wagner
THE WAGNER FIRM
1801 Avenue of the Stars
Suite 307
Los Angeles, CA 90067

Kara M. Wolke
GLANCY BINKOW & GOLDBERG LLP
kwolke@glancylaw.com